## WALKER HARGROVE V. THE STATE.

*No. 382.  Decided June 9.*

33 431
33 546
33 481
36 319
39 46

**1. Defendant as Witness—Impeachment by Showing His Commission of Other Crimes—Failure to Limit and Restrict Such Evidence in the Charge.** On a trial for murder, where defendant was a witness in his own behalf, and on cross-examination was compelled, over his objection, to state that he had at one time been convicted in another case for the murder of another party, but that, a new trial having been granted, he was afterwards acquitted, *Held*, that the evidence being admissible only as affecting his credibility, the court in its *written* charge to the jury should have limited and restricted it to that purpose, whether requested or not, and that a correct verbal instruction to the jury in that regard could not supersede the necessity for such written charge.

**2. Murder—Misconduct of Jury—Receiving Other Testimony—New Trial.** Article 777, subdivision 7, Code of Criminal Procedure, declares, that a new trial should be granted where the jury, after retiring to deliberate upon a case, have received other testimony. *Held*, on a trial for murder a new trial should have been granted which was supported by the affidavits of three of the jurors trying the case, averring that while the jury were considering of their verdict some of their fellow jurors stated, in effect, that the reputation of defendant and his father and brother as peaceable citizens was bad; that defendant's reputation for truth and veracity was bad; that defendant had murdered several men, and was a hardened criminal, which affidavits were not traversed and controverted by counter affidavits which do not deny in terms the damaging statements charged to have been made.

**3. Defendant as Witness—Criminating Himself—Res Gestæ.—**On a trial for the murder of one party it is not error for the court to compel a defendant, when testifying as a witness, to answer whether or not he killed another party in the same difficulty, his objection being that he could not be made to subject himself to another prosecution for murder. *Held*, the two killings were res gestæ, and moreover, that defendant, when he becomes a witness, waives his constitutional protection and subjects himself to be examined as to any and every matter pertinent to the issue, and as to all matters connected with the offense.

**4. Same—Impeachment of—New Trial.—**A defendant as a witness, for purposes of impeachment, may be asked if he has not been convicted of a felony, and the fact that a new trial was granted does not entitle him to avail of the statute (Code of Criminal Procedure, article 783), which provides, that when a new trial has been granted "the former conviction shall be regarded as no presumption of guilt, nor shall it be alluded to in the argument." That statute only applies to cases where a defendant is a second time on trial in a case where he has been convicted and a new trial granted.

5. **Same.**—While it is true that a party charged with crime may have been acquitted, still the fact that he was so charged is competent evidence to go to the jury as reflecting upon his character.

6. **Same—Presumption of Innocence.**—As a rule, the presumption of innocence only applies in the case for which a defendant is on trial charged with crime.

7. **Charge—Homicide in Defense of Another—Mutual Combat.**—On a trial for murder, where the issues raised by the evidence were: first, whether the deceased was killed in pursuance of an agreement between defendant, his father, and brother; second, whether deceased was killed by defendant in protection of the life of his father or brother; .or third, whether deceased was killed in mutual combat; *Held*, that a charge which correctly presents the State's theory is insufficient, if it presents the theory of the defense in a very negative form. *Held*, further, that in such a case the court should have instructed the jury, that unless the evidence satisfied them, beyond a reasonable doubt, that there was an agreement between defendant, his father, and brother to kill deceased, and he was killed in pursuance thereof, or that he was killed in a mutual combat, voluntarily entered into by all the parties, they must acquit defendant, unless they were further satisfied that defendant's father and brother began the difficulty, and defendant knew it when he entered into the conflict.

APPEAL from the District Court of Tarrant. Tried below before Hon. W. D. HARRIS.

Appellant was indicted for the murder of one H. W. Spear, by shooting him with a pistol, and at the trial was convicted of murder in the second degree, with his punishment assessed at imprisonment in the penitentiary for twenty-five years.

H. W. Spear, the deceased, was killed on Friday, December 23, 1892, about 4:40 p. m., at the village of Arlington, in Tarrant County, a regular station on the Texas Pacific Railroad, between Fort Worth and Dallas, and fourteen miles east of Fort Worth. Deceased was killed in a fight, which occurred about the time mentioned, in which he and one Bill Smith were the parties engaged on the one side, and George W. Hargrove, Sr., George W. Hargrove, Jr., and appellant, Walker Hargrove, the two latter being sons of the former, being the parties engaged on the other side.

The conflict resulted in the death of all the parties engaged in it, except this appellant, three being killed outright, and George Hargrove, Sr., dying shortly after of his wounds. The Hargroves were passengers on the east-bound passenger train, and Arlington was their destination. When the train stopped, and just as they were getting off, deceased (Spear) and Bill Smith were approaching to get on the train to Dallas. George Hargrove, Sr., and George Hargrove, Jr., had already descended to the ground, and as they were moving along the side of the train towards the platform of the depot they passed Spear and Smith without anything being said between the parties, and Spear was in the act of ascending to the platform to the cars, when it seems that he and George Hargrove, Sr., both looked back about the same time and the firing began. As is usually the case, there is some con-

flict in the testimony as to who made the first threatening demonstrations; but the evidence seems to preponderate as to the fact that Spear drew his pistol first and fired two shots in rapid succession at the two Hargroves, one at each, and that George Hargrove, Sr., after being wounded, crawled beneath the cars from the north to the south side before he drew his pistol and fired his first shot; and that what shooting he did was done while he was lying upon the ground and unable to get up. When the conflict began, defendant was upon the platform of the cars with a Winchester gun in his hand, and it seems that Smith, who had also been firing at his father and brother, seeing him emerge from the car to the platform, fired at him but missed, when defendant returned the fire with his Winchester, and this shot, it is supposed, is the one that killed Smith. When defendant reached the ground he found Spear beating his brother, who was down, over the head with a pistol. He endeavored to use his Winchester upon him, but, the gun failing to work, he threw it upon the platform of the cars, and, drawing his pistol, commenced firing it at Spear, who turned on him and fired at him until he (Spear) was killed.

The justice of the peace who held the coroner's inquest over Spear, Smith, and George Hargrove, Jr., testified, that W. H. Spear had seven bullet holes in his body—four in the head and three in the breast, entering from the front. They were wounds from pistol-shots. George Hargrove had three bullet holes in the breast and one in the arm, entering from the front; they were made by pistol-shots. Bill Smith had only one shot, which entered the breast and came out behind, lower down. He also testified, that the head of George Hargrove, Jr., was bruised up like it had been struck with something. Don't know whether the skull was broken or not. There were two or three large cuts or bruises just above the forehead, and two or three further back, caused by heavy blows; looked like they might have been made by striking with a pistol. Spear had no bruise on his head except where he was shot. He said: "I examined Spear's pistol; it was broken. The handles were hanging loose, and the rod on the barrel was bent, and had blood on it."

The difficulty originated between George Hargrove, Sr., and W. H. Spear, deceased, sometime in the month of September or October previous to the killing, and grew out of dealings between the parties in regard to some horses. Spear had let Hargrove have some horses to drive to market, and when Hargrove had reached Mount Vernon, in Franklin County, Spear attached the horses. Hargrove became enraged, armed himself with a shotgun, and was endeavoring to get an opportunity to shoot Spear, when he was arrested and put in jail at Mount Vernon. He threatened to fix Spear for the lies he had sworn on him. Matlock, a witness for defendant, testified, that shortly after this trouble at Mount Vernon Spear told him that he (Spear) had let

old man Hargrove have some horses, and that some of them were stolen. That old man Hargrove had found out that some of the horses were stolen, and that he would have to kill him to get him out of the way: That Hargrove would be a witness against him about the horses, and that it was cheaper to kill old man Hargrove than it was to go to the penitentiary.

On the Monday before the killing old man Hargrove was boarding at the Atlanta hotel, in Fort Worth, and was occupying a room in the west end of the house, next to a vacant lot. That night deceased (Spear) was found in this vacant lot about 12 o'clock, squatted down behind a high board fence, with a shotgun lying across his lap and a six-shooter in his hand; and when arrested by the police, who told him that they knew all about his trouble with Hargrove, he said that if they (the police) had waited a few minutes later the thing would have been all over; that he had stood it as long as he could; that the Hargroves had kept him away from home for two weeks, and had sent him word that they were coming out there and kill everything on his place; that it was only a question of killing or being killed. It seems that Spear had found out that old man Hargrove had mortgaged a horse to Culbertson & Wright and then sold the horse to another party, and he employed a policeman to go after the horse, so that he could prosecute Hargrove for selling mortgaged property. This was the day after he had been arrested for attempting to assassinate Hargrove in the vacant lot. The policeman went to see Hargrove about it, and Hargrove told him he need not go after the horse, as he had already made arrangement with the agent of Culbertson & Wright to fix the matter up by executing his note, with Ben Allen and D. A. Matthews, of Arlington, as sureties, and turn it over to the agent and take up the mortgage. The policeman told him that he had been paid by Spear, and would start after the horse the next day, and would be back on Saturday. The policeman went to Spear to see if he could not settle the trouble with Hargrove. Hargrove claimed that Spear owed him $300, but that he would take $200 and settle, rather than have any further trouble. Spear told the policeman that he would pay Hargrove nothing; that if he was to pay him the $200 that would not settle the trouble; and that it was cheaper to settle the trouble by killing Hargrove than it was to pay the $200. Hargrove claimed that Spear owed him for some horses they had been lawing over at Mount Vernon.

John Maddox, witness for defendant, testified: "I am city marshal of Fort Worth. I saw Spear over the Triangle saloon. Spear wanted me to hold the police back and not let them arrest him, so that he could shoot old man Hargrove. He said that if the police had not been quite so fast he would have gotten the Hargroves the night he was arrested. Spear said he had them located, and would have gotten them two in a row. It was the night before I saw him that he was arrested on the

vacant lot back of the hotel where old man Hargrove slept. Spear had a shotgun when I saw him over the Triangle saloon. Spear told me that old man Hargrove had traded a mortgaged horse, and that he wanted Hargrove arrested for selling the mortgaged property."

Cross-examined: "I told Spear, when he told me he wanted me to hold the police back, that I would do no such thing; that if he was found out in town in the act of doing mischief I would certainly have him arrested. He told me, at the time he said he wanted old man Hargrove arrested for selling the mortgaged property, that if he could get the old man in jail for selling the mortgaged property, he (Spear) would beat the case at Mount Vernon. The suit at Mount Vernon was something about some horses."

It was proved by W. J. Tackaberry, that he held the claim against D. W. Hargrove, Sr., for collection, which claim was secured by a mortgage upon the buggy and horse which Hargrove afterwards sold, and that on the 20th of December, three days before the killing, he had agreed with Hargrove that he would surrender the note and mortgage if he would execute a new note, with Ben Mathews and Bill Elliott of Arlington as securities, Hargrove promising to take the note the next day, or day following, and have it signed. That witness prepared the note and delivered it to Hargrove. This note, which was for $109.90, was found on the person of Hargrove after he was mortally wounded in the fight at Arlington, and accounts for the reason of his journey with his sons to Arlington on the day of the fatal rencounter.

There was testimony of mutual serious threats between G. W. Hargrove, Sr., and the deceased, H. W. Spear, from the date of the origin of their troubles up to the time of the killing. It was moreover proven by a number of witnesses, that the reputation of the deceased (H. W. Spear) as a man of peace was bad; that he was of violent temper, and a man who was likely to execute any threat which he might have made. The testimony shows, that no trouble had ever occurred between defendant and the deceased, but that on the contrary they had been friendly; that defendant had been to the house often; and Mrs. Spear, wife of deceased, testified: "Was there last, and brought some cattle for my husband, about two months before the final trouble. He and my husband were on friendly terms, and never had any trouble before the day of the death of my husband." This witness also stated, "that she went with Bill Smith and her husband to Arlington on the day of the killing; that they reached there about 2 o'clock; that she returned home, leaving them there, and that they told her they were going to eastern Texas."

The testimony of the defendant, Walker Hargrove, is as follows: "I am the defendant in this case. I am a son of George Hargrove, Sr., and a brother of George Hargrove, Jr., both deceased. Was at

Arlington on December 23, 1892, at the time Spear was killed. I had been in Cleburne for about two or three weeks, and came home to Fort Worth on Tuesday evening before the trouble at Arlington, which was on Friday. I got to Fort Worth about 8 or 9 o'clock p. m., and walked up-town from the depot, and met my father on Main street, and he told me about Spear's arrest the night before, on the vacant lot in the rear of his boarding house, and that Spear had tried to kill him, and had threatened to kill him. This was the first I heard of the trouble. I knew that they had had some trouble in eastern Texas over some horses my father bought of Spear, but thought that was all over, and was not expecting any trouble at this time. I saw my father on the morning of the 23rd of December. He told me he had to go to Arlington to fix up a note, and showed me the note in evidence as a part of the Tackaberry statement. I told him not to go; that if he should happen to meet Spear there, he (Spear) would kill him or get him in trouble. He said that he was compelled to go; that he had sold a mortgaged horse, and the parties had agreed to let him fix it up with a note, with Bill Elliott and Ben Mathews as sureties, and he had to go that day to get Elliott and Mathews to sign it; that he was about to be prosecuted for disposing of the horse; that Sebe Maddox had gone after the horse, and would be back next day. He asked me to go to Arlington with him. I told him if he was compelled to go I would go with him, provided he would promise me not to drink any, and to go down on the late train at 4 p. m., and come back on the 7 o'clock train that same evening. He said he would do that, and George and myself went with him, leaving Fort Worth about 4:10 o'clock, and arriving there about 4:40 p. m. I was not at Holland's theatre that evening between 3 and 4 o'clock, and was not there that day at any time. I had no gun there. I did not make any statement to George Holland that evening. Did not tell him I was going to hunt a man, or anything of that kind. George Holland and I had had some short words a short time before that, and we were not on good terms at that time. I had not been in his house since our trouble. He got mad at me because I had a friend there one night who was drunk, and I took him away and would not let him drink at his bar. Holland got mad, and said he would get even with me. The reason I took my friend away was he had some money, and Holland's girls were trying to get him to blow it in for beer. As we went to the depot that evening we went by Ridgeway's saloon and got a gun we left there that forenoon, and went from there to the depot. Ridgeway's saloon was on the corner of Twelfth and Calhoun streets, and is two blocks east and one block south from Holland's theatre, in the direction of the depot from Holland's. I had no gun when I got to Ridgeway's. My father told me to get the gun. I think Bill Routh was there when I got it. That is the gun I carried to Arlington. When I left Ridgeway's I went east on Twelfth street

to Jones street, and from there to the depot. Holland's theatre was back the other way from Ridgeway's. When I got to the depot I went into the rear coach and took a seat on the right, and set my gun with the muzzle down against the window by my side. I afterwards, before the train left for Arlington, took my gun in the closet and left it, where it remained until I got to Arlington. I did not have the gun by my side between Fort Worth and Arlington. While the train was standing at the depot in Fort Worth, my father and brother came in and took seats in the same car I was in. I saw J. J. Fulford come in and have some talk with my father, and they went out of the car, and directly my father came back in and I asked him what Fulford wanted. He then told me what he had said to him, and showed me a note. It was the note referred to in Tackaberry's evidence, and was the note exhibited to me at this time. My father put the note back in his pocketbook, in his pocket, and I saw it no more until after the trouble. Just before we got to Arlington we all went in the closet, but were not all in at the same time. When the train stopped at Arlington we all started out at the front end of the rear coach. I stopped and went into the closet and got the Winchester, and my father and brother went on ahead of me. After getting the Winchester I started out of the car door. My father and brother at that time had gotten down off the rear platform of the middle coach on to the ground, and were starting east in the direction of the depot office and waiting room. Just as they were leaving the steps they met Spear and Smith, and passed them and got out of my sight around the end of the coach, and I did not see them any more until after the shooting commenced and was nearly over. Just as Spear and Smith passed my father and brother they stopped at the rear end of the middle coach, and Spear took hold of the rod as if to get up on the step, and then let go and said to Smith, 'Now, Bill,' and as he said that drew his pistol and fired in the direction of my father and brother. He fired two shots in quick succession, which were the first shots fired. About that time I saw Bill Smith fire his pistol in the direction of my father and brother, and then turned and fired one shot at me, and it passed up near my face. When I first saw Spear he was right at the rear steps of the middle coach, and the people began to push back inside the car door. I was almost in the door when the first shot was fired. The people on the platform commenced crowding me. I finally got down on the ground by the rear steps of the middle coach, and saw my brother George lying down on the ground and Spear beating him over the head with a pistol. My brother held his hand and arm up over his head, as if to ward off Spear's blows and protect his head. My brother was lying on the ground about the front end of the middle coach, and Spear was down over him. I tried to fire the Winchester at him, but it would not work, and I pitched it up on the platform in the car door, and

drew my pistol and commenced firing at Spear. The first time I fired at him he raised up and turned facing me and raised his pistol, and I fired again, and he snapped his pistol towards me. I shot at him four times, advancing on him all the time, and was within a few feet of him when I fired the last shot. The last shot I fired at him struck him in the head, and he fell over on the ground. I then turned and went away, and did not strike Spear nor attempt to strike him, nor to do anything more to him. I think the first three shots I fired at him struck him about the breast. When I shot at Spear the third time he staggered up against the depot platform, and rested his elbow on the platform and pointed his pistol towards me. I then fired the fourth shot and Spear fell over on the ground. I came directly to Fort Worth that evening, and remained here until arrested. I left Arlington when I did because I did not know but Spear might have some friends there, and I might have trouble with them. I did not know that Spear was at Arlington, or that he expected to be there, until I saw him about the time he passed my father and brother as they were getting off the train, as before stated. I had heard of Spear's arrest in Fort Worth, on the vacant lot just in the rear of my father's boarding house, and his attempt to kill my father, and his threats to kill him, and that is why I armed myself and went to Arlington with him. My only purpose was to defend my father in the event Spear happened to be there and attempted to kill him. I never had any trouble with Spear in my life, and had no ill-will towards him at any time. We had dealings together frequently, and never had any trouble. I staid all night at his house a short time before the trouble. When my father got in a law suit in eastern Texas, my father telegraphed me to come. I did not know what he wanted till I got there. I then learned of the suit between my father and Spear in regard to the horses, and that my father wanted me as a witness in the case. My father and Spear came near having a difficulty while I was there, but I knew nothing of it, and had nothing to do with their trouble, except to do what I could to get the matter adjusted. Spear and I talked the matter over in a friendly way while there, and we were together a good deal there; and then Spear and I got on the train there and came all the way home together, he coming on to Fort Worth. I bought cattle for Spear in my name a short time before the trouble, and carried them to his place and staid all night with him. I bought them in my name, because he was afraid his creditors would get them if they were bought in his name. I did it as accommodation to Spear, because he asked me to.''

Cross-examined: '' We went by the way of the Ridgeway saloon, and father said for me to get the gun. I said, 'We won't need it;' but father said, 'Get it, any way.' This was as we went to the depot, going to start to Arlington. It was near about 4 o'clock when we left the

Ridgeway saloon. We went directly to the depot, and the train was about ready to pull out when we got there; only waited a few minutes. I did not carry the Winchester to Arlington by my side. I put it in the closet before the train left Fort Worth, and never took it out until we got to Arlington. I did not dodge back and forth in and out of the car door. I never fired any shots out of the car window. I did not do any shooting until I got out of the car door. Spear fired the first two shots, and almost instantly Smith fired the third shot. I was looking at them. They shot in the direction of my father and brother. I never fired the Winchester at Spear after I got on the ground and saw Spear beating my brother over the head with his pistol. I tried to fire the Winchester at Spear, but the gun would not work, and I threw it back on the car. I then drew my pistol and began shooting at Spear. I shot Spear to protect my father and myself. I did not run back and forth on the ground. I advanced on Spear from the first shot that I fired at him until the last. After I shot at Spear the first time he rose up and faced me, raised his pistol, and advanced a little, until the third shot, when he staggered up against the platform, rested his elbows on it, and leveled his pistol at me. I fired the last shot at his head and he fell back east."

Question (by county attorney): "Walker, who killed Bill Smith?"

Defendant objected to the question.

Question (by county attorney): "Walker, did not you kill Bill Smith?"

The defendant objected to both questions, for the reasons as stated in the defendant's bill of exceptions filed in this case. The court overruled the objection, and required the defendant to answer the question. Defendant excepted. Defendant then refused to answer, and appealed to the court in person, claiming his privilege as shown in the bill of exceptions filed in this case. The court compelled the defendant to answer the questions. The defendant answered: "I shot Bill Smith with the Winchester. I shot him one time. I do not know what went with Smith after I shot him. This shot was fired before I got off the car platform. I was coming out, as I have already stated, with the Winchester in my hand. I saw Spear fire two shots in the direction of father and brother. Smith fired one shot in the same direction. Then Smith looked up and saw me, and raised his pistol and fired at me; the ball passed just over my shoulder and near my face, and came so close I felt it brush my face. I immediately raised my gun from my side and fired at Smith. I think I hit him. He seemed to sink down and disappear. The people were rushing and crowding me. I finally got on the ground and saw Spear beating my brother, as I have stated. I did not see Smith any more. I had no personal ill-will at Smith. I shot him because he first shot at me. I did it in self-defense. By the time I shot Smith, Spear had disappeared in the

direction my father and brother had gone. I heard firing in that direction. A number of shots were fired before I got on the ground. I did not go to Arlington for the purpose of killing Spear or Smith. I went because father said he had to go on business; said he had to get a note signed by Bill Elliott and Ben Mathews; and father wanted me to go with him. I had not been carrying a pistol before we started to Arlington. It was my own pistol that I carried to Arlington, the one I shot Spear with. I had owned it for several years, but my father had been keeping it. I got it from father the day we went to Arlington, before we started. I went armed, because I had heard that Spear had tried to kill father, and had threatened to kill him the first time he saw him. I was afraid Spear would kill father, and I went with him to protect him if Spear attacked him. There was no agreement that we were to shoot Spear if we found him. I had no intention of killing Spear when I left Fort Worth, unless it was necessary to protect father in case Spear should attempt to kill him."

Question (by county attorney): "Walker, have you not been tried for murder in this court before?"

Defendant objected for the reason mentioned in defendant's bill of exceptions in this case. The court overruled his objection. The defendant excepted. Defendant answers, "I was, and was honorably acquitted."

Question (by county attorney): "Walker, were you not tried and convicted in this court for the murder of Henry Tackett?"

Defendant objected on the ground mentioned in defendant's bill of exceptions, and the court overruled the objection, stating to defendant's attorney, in the presence and hearing of the jury: "You can have your bill, and put whatever you please in it. Witness must answer the question." Defendant excepted, as shown by bill of exception, and defendant answered: "I was tried and convicted for the murder of Henry Tackett."

Redirect: "After I was first tried and convicted the court gave me a new trial, and I was acquitted."

Defendant reserved a bill of exceptions to the court's having compelled him, on cross-examination, whilst a witness in his own behalf, to testify to the fact that he had killed other parties besides the deceased. The following is the bill of exceptions relative to it, viz:

"Be it remembered, that upon the trial of the above cause, when the defendant was upon the stand as a witness in his own behalf, the county attorney asked him, 'Have you not been tried for murder here in this court before?' To which the defendant objected, upon the ground that said evidence was immaterial, irrelevant, and incompetent, and calculated to prejudice the jury; which said objection was by the court overruled, and the defendant was compelled to answer said question. Whereupon the defendant replied, that he had been tried for

murder and honorably acquitted.    Whereupon the county attorney asked defendant if he (defendant) had not been tried and convicted in this county for the murder of Henry Tackett.    To which the defendant objected, that the record was the best evidence; and further, that said evidence was irrelevant and immaterial, and calculated to prejudice the jury.    All of which objections were by the court overruled, and defendant was compelled to testify that he had been tried and convicted for the murder of said Tackett, but that the conviction had been set aside, and that defendant had been finally acquitted.    To all of which rulings of the court the defendant then and there excepted.

"And the county attorney further asked the defendant: 'Walker, didn't you kill Bill Smith?'    To which the defendant objected, that an indictment was then pending against defendant in this court for the murder of said Smith, and that he could not be compelled to criminate himself, and the defendant personally appealed to the court for protection, and claimed his privilege and refused to answer, but the court overruled these objections and compelled him to answer.    Whereupon defendant admitted that he killed said Smith.    The defendant further objected to said question, upon the ground that it was immaterial, so far as the killing of Spear was concerned, and that it was only calculated to prejudice the defendant in his case.    All of said objections were overruled by the court, and the defendant then and there excepted to each and all of said rulings, and tenders this his bill of exceptions," etc.

This bill is approved, with the explanation that the evidence as to the conviction of appellant for the murder of Henry Tackett was only admitted for the purpose of affecting the credibility of defendant as a witness, and that the evidence as to the killing of Smith was admitted as part of the res gestæ.

After the general charge to the jury had been given, defendant excepted to it, among other reasons, because "the court failed and refused to instruct the jury for what purpose the evidence was admitted that defendant had killed one Bill Smith, and in not limiting the jury, in their consideration of this evidence, to such purpose."    And also made similar objection to the charge in relation to defendant's testimony as to his killing one Tackett.

In approving this bill of exception, the court added the following explanation: "1. That at the time the evidence of defendant as to his having killed Smith was inquired after, the court stated to the counsel and jury that said testimony was admitted, and the defendant required to testify thereto, because it was a part of the transaction or connected with the transaction in which Spear was killed, and not for the purpose of having the jury consider the charge made against defendant in the other indictment, which other indictment the defendant

and his attorneys had at the time voluntarily stated was pending against the defendant."

"2. That the exception to not instructing the jury as to the purpose for which the testimony as to the trial for killing Tackett was not made until the jury were retiring from the room a second time, after having been in their room for one night and a portion of the day, and when they had been in court only for the purpose of asking a question as to whether the name of one party had not been inadvertently used for another in one place in the charge of the court. And further, the court distinctly stated to the jury, at the time the testimony as to the Tackett charge was called for, that it could be admitted only as effecting the credibility of the defendant as a witness, and not for any other purpose."

One of the grounds for defendant's motion for a new trial was, that the jury, after their retirement to consider of their verdict, received other evidence in addition to that testified to upon the witness stand.

In support of this ground for a new trial, appellant filed the affidavits of J. L. Dodson, G. E. Chorn, and J. N. Nelms. The affidavit of J. L. Dodson shows that he served upon the jury in this case; that after the jury had retired to consider their verdict, and before the verdict had been agreed upon, certain members of the jury stated, in the presence and hearing of other members of the jury, "that they knew appellant, Walker Hargrove, and his father, George W. Hargrove, Sr., and George W. Hargrove, Jr., and that their reputation for being peaceable, quiet citizens was very bad; that they were a bad set; that appellant's reputation for truth was bad; that appellant had murdered several men before, and was a hardened criminal, and if turned loose he would kill somebody else." That after said statements had been made, W. W. Strawn, who was a member of said jury, as well as other members of the jury who had up to the time of the making of said statements been for acquittal, or for a term not exceeding ten years in the penitentiary, agreed to the verdict rendered.

The affidavit of G. E. Chorn shows that he served upon the jury in this case. That while the jury were considering their verdict, after their retirement, and before a verdict had been agreed upon, certain members of the jury stated to and in the presence of other members of the jury, "that the reputation of defendant and his father and brother for being peaceable, law-abiding citizens was very bad; that they were a hard set; that defendant's reputation for truth and veracity was very bad; that defendant had murdered several men, and is a hardened criminal now;" and that after said statements were made several of the jurors who had been for acquittal, or for a term of not more than ten years in the penitentiary, agreed to the verdict rendered.

The affidavit of J. W. Nelms shows that he was a member of the jury in this case, and that while the jury were out considering their

verdict W. W Strawn, one of the jurors, said something about Bill Smith being a desperately bad man, to which Thomas Lofton, a member of the said jury replied, "Well, see what defendant has done; he killed a man before this; he is a bad man;" that before said remarks were made some of the jury had been for acquittal or for a low term, and thereafter agreed to the verdict rendered.

The counter affidavit filed by the State, and which was signed by two of the jurors who tried the case, viz., W. J. Jordan and B. F. Crowley, was as follows: "After said jury had received the written instructions of the court and had retired to consider of their verdict, about the following remarks were made, to wit: Some member of the jury said that old man Hargrove, father of defendant, was a bad man. Some other member of the jury then spoke up and said, 'Yes, and the boys, Walker and George, are bad boys; they are always getting into trouble;' that after these remarks were made other members of the jury immediately rebuked those who made them, and admonished the jury that they could not consider such matters; that the defendant could only be tried for what he had done in this case, and that they could only consider the evidence in this case; that the remarks were very few, and made in a very short while; that after that no further reference was made to defendant's character or the character of his father or brother, so far as we know, in any manner. The above remarks were made four or five hours before any verdict was agreed upon; that upon the first ballot, and before the above remarks were made, every member of the jury had voted that defendant was guilty of murder; that the only difficulty of said jury was to agree upon the number of years defendant should be confined in the penitentiary; that the term of years ranged all the way from five years to life imprisonment; that on the first ballot, and before said remarks were made, six of the jury were in favor of over twenty-five years and six under twenty-five years' imprisonment; that all of said jurors soon agreed to twenty-five years, except W. W. Strawn. Affiants further say, that there was no improper influence brought to bear upon said jury or any member thereof; that to the best of affiants' knowledge and belief, at no time before said jury agreed to their verdict did any member of said jury say or refer to the fact that defendant's reputation for truth and veracity was bad."

Many objections were urged to the charge of the court, and others to the refusal of the court to give special requested instructions for the defendant.

We will not reproduce the charge of the court, nor the special requested instructions refused. Suffice it to say, that the court, in the opinion below, remarks that there is much force in the criticism of the court's charge made by able counsel for appellant, in that it presents the theory that the elder Hargrove began the difficulty and fired

the first shot at Spear, when the evidence leaves it in doubt which of the parties made the first demonstration, and the uncontradicted testimony shows that deceased fired upon the elder Hargrove before the latter drew his pistol. Again, that said charge did not present the theory of defendant, to the effect that there was no agreement upon the part of defendant, his father, and brother to kill Spear, but that defendant went to Arlington with a view to prevent a difficulty between his father and Spear, and, if necessary, to protect his father's life, except in a very negative form.

*Parker & Harris* and *Furman & Bowlin*, for appellant.—The theory of the defense was two-fold: first, that the killing was done in self-defense, pure and simple; second, that appellant had never participated in any of the previous animosities and difficulties existing between George W. Hargrove, his father, and H. W. Spear, and was ignorant of the threats made by his said father against said Spear, and that although appellant may have known of the hostility entertained by his said father towards said Spear, and may have known that the combat between them was voluntary and mutual, yet if he did not join, by word, act, or intent, in the beginning of said conflict, and in fact disapproved of it, and when he saw his said father and brother shot down by said Spear and Smith, and saw Spear striking the prostrate form of his brother over the head with a pistol, if appellant, acting under the impulse of sudden and irresistible passion, then for the first time participated in the conflict and killed said Spear, he would not be guilty of more than manslaughter.

Upon these theories the case was tried, and, as we believe, influenced by errors committed by the court during the trial, and through statements made in the jury room by one of the jurors as to matters not in evidence, a compromise verdict was reached, and appellant was found guilty of murder in the second degree.

It was error for the court to admit in evidence and to compel defendant, upon his cross-examination as a witness, to testify to his having killed one Henry Tackett, for which killing he had been tried and convicted, but that the conviction had been set aside and he had been acquitted on a second trial. It was also error to compel him, as a witness, to testify as to whether or not he killed Bill Smith, who was killed in the same difficulty in which Spear was killed, and for whose killing defendant was then on trial; to which the defendant objected, that an indictment was then pending against defendant in this court for the murder of said Smith, and that he could not be compelled to criminate himself, and the defendant personally appealed to the court for protection, and claimed his privilege and refused to answer; but the court overruled these objections and compelled him to answer. Whereupon defendant admitted that he killed said Smith. The de-

fendant further objected to said question, upon the ground that it was immaterial, so far as the killing of Spear was concerned, and that it was only calculated to prejudice the defendant in his case.

We have carefully read the opinion by Judge Simkins in Carroll v. The State, 32 Texas Criminal Reports, 431. It is not decisive of either of the questions raised by our bill of exceptions. In that case the court held, that it was not error to allow the State on cross-examination to prove that one of the witnesses for the defense "was then under indictment for theft." In affirming the conviction, Judge Simkins limits such cross-examination "to transactions comparatively recent, bearing directly upon the present character of the witness, and essential to the true estimation of his testimony by the jury," and says: "It should be the care of the trial judge to confine the interrogatory to matters coming within said limitations, and promptly suppress all inquiry into matters not recent nor relevant to credit, otherwise the witness-box would become a source of scandal and an offense."

It was not shown that the trial and conviction of appellant for the murder of Tackett was recent. Its bearing upon the present character of the witness is not shown. Certainly it would not be permissible to assail the general reputation of a witness for truth and veracity in such an indefinite manner. Impeaching witnesses would be limited to the time of the trial. Evidence that at some indefinite period the character of a witness had been bad, in this respect, would be incompetent. The inquiry must be limited to the present status of the witness.

Even if it be permissible to prove that a witness has been tried and convicted, for the purpose of discrediting him, this can only be lawfully done by a production of the record itself, unless it be first shown that the record has been destroyed. The common law provides that the record is the best evidence of what it contains, and prohibits the introduction of secondary evidence. Our statute in express terms prohibits such a question for the purpose of disqualifying a juror. Willson's Crim. Stats., sec. 2284. To disqualify a convicted felon from testifying, the judgment of conviction must be shown. If this be done, and a pardon is relied upon to restore competency, the pardon must be produced. Willson's Crim. Stats., notes to sec. 2434. We are not aware of any reason why there should be a relaxation of the rules of evidence in such cases as this. This objection was not presented and passed upon in Carroll's case.

Even if it be permissible to prove that a witness has been tried and convicted of an offense, for the purpose of affecting his credibility, this character of evidence should be limited to cases where the convictions were sustained.

In cases where a conviction has been set aside by the courts and an acquittal subsequently rendered, the judgment of conviction stands as though it had never been rendered, and it can not be lawfully used for

any purpose whatever. To allow evidence that an indictment is pending against a witness, for the purpose of affecting his credibility, is occupying exceedingly dangerous ground. A witness is responsible for and should be affected by his voluntary conduct. Therefore the character of his associations may be rightfully inquired into for the purpose of affecting his credit, for they are of his own choosing. But that a witness' credit should be affected by the pendency of an accusation, when no proof has been adduced in support thereof, and no opportunity has been allowed him to make his defense, is to our minds manifest wrong and injustice. We will say frankly that we do not agree with the doctrine of Carroll v. The State, for the reason that it substitutes assumption for testimony, and gives preference to the presumption of guilt over that of innocence. It presumes guilt from accusation, in violation of the statute, which declares that every person accused of crime shall be presumed to be innocent until proven to be guilty. It makes the credibility of a witness depend not upon what he is or has done, but upon the malice of some enemy who may have lodged an unfounded accusation against him, or upon the mistake of a grand jury in presenting an indictment upon insufficient or malicious evidence. If this is to be the settled practice in our State, we believe that it will become a means of great imposition and rank injustice. We have not made these criticisms upon Carroll v. The State because that decision stands in our way at the present time. We think that the distinctions between the point there decided and those now presented are clear, and that Carroll's case is not an authority against us. But we regard Carroll's case as wrong in principle; we look upon it as a dangerous departure from the path of justice and safety, and we feel that it is the duty of the bar of the State to deal honestly with the courts, and never to hesitate, in a respectful manner, to sound a note of warning at the approach of danger. We may be mistaken, but these are our views, and we give them to the court for what they are worth, be it much, little, or nothing.

But concede that we are wrong, and that a mere accusation without proof should be admitted to affect the credibility of a witness, it does not follow that an accusation, which has been tried and by a solemn judgment of the court pronounced false, should be so used. In this case the appellant was forced to testify that he had been tried and convicted for the murder of one Henry Tackett, but that the conviction had been set aside, and upon a subsequent trial he had been honorably acquitted. Our statute declares, that in case of a new trial "the former conviction shall be regarded as no presumption of guilt, nor shall it be alluded to in the argument." Willson's Crim. Stats., sec. 2556. A new trial having been granted, the conviction is adjudged to have been unlawful. It requires no argument to sustain the proposition that an unlawful conviction can not be lawfully used to the prejudice

of the party against whom it was rendered. When a new trial is granted the judgment of conviction becomes a nullity; it stands as though it had never been rendered. The court can not give it vitality for any purpose. To do so is to impeach the judgment setting it aside, as well as the subsequent judgment of acquittal. Even though it may be true that appellant was guilty of murder in killing Tackett, this is not a crime like that of theft and those of similar kind, which show a depraved nature, and therefore are relevant to character. A man can not steal and be other than corrupt. A man may kill, and still be a gentleman in every sense of the word and worthy of the highest credit. Sudden passion, wounded honor, insult to female relatives, and many other causes consistent with credit, often leads men of the purest character to take life, especially in our southern country.

Even under Carroll's case, if our other objections are not good, this evidence should have been rejected, because it was not relevant to credit, and did not bear "directly on the present character of the witness."

The bill of exceptions to the admission of the evidence that appellant killed Bill Smith presents a different question. This was not admitted to affect credibility, but as a part of the res gestæ. The question is this: Where several indictments for separate offenses grow out of practically one transaction, can a witness in one of these cases be compelled to criminate himself as to an offense charged in another one of these indictments, because the matter inquired of transpired at the time of the transaction on account of which the separate offenses are charged, upon the ground that it is a part of the res gestæ? We place our objection to the evidence solely upon the ground of privilege. The bill of exceptions shows that appellant personally appealed to the court for protection, and claimed his privilege upon the ground that another indictment was then pending against him in the same court for the murder of said Smith, the said Smith and Spear being killed in the same conflict.

Mr. Wharton says: "A witness will not be compelled to answer any question, the reply to which will supply evidence by which he could be convicted of a criminal offense." Whart. Crim. Ev., sec. 463. We could cite authorities indefinitely to the same effect. The appellant having voluntarily taken the witness stand, and the question as to his guilt for killing Spear being the point at issue, he could not refuse to answer any proper question upon the ground that it would criminate him for killing Spear. So far as the Spear case was concerned, he could not get the benefit of his own evidence upon facts favorable to himself and escape the burdens of what he knew detrimental to his interests. But when he is asked a question, the answer to which would involve him in another and separate criminal charge, quite a different question is presented.

Our contention is, that the evidence that appellant had been tried and convicted for killing Tackett, although subsequently acquitted, and that he killed Bill Smith, could not have any other effect than that of inflaming the minds of the jury against him.   Even if this evidence was properly admitted, there was error in the action of the court in refusing to instruct the jury as to the purposes for which it was admitted, and in requiring them to confine their consideration of this evidence to these purposes.   The court, in the explanation appended to this bill of exceptions, states that the reason why the instructions were refused was because the court stated the purpose for which the evidence was admitted at the time of its reception; and further, that the exception as to the refusal to give the instructions relative to the trial and conviction of appellant for the murder of Tackett was not made until after the jury had retired from the court room and had been considering their verdict for one night and a part of a day, and had come into the court room to ask an explanation of a portion of the instructions given, and were in the act of retiring again.

This explanation of the court involves two propositions, neither of which is the law.   The first is, that where evidence of particular independent facts are admitted, and the purpose of their admission is explained at the time, it is not necessary for the court to repeat the explanation in the instructions.   The second is, that it is too late to except to the refusal of the court to give special instructions after the jury have retired, or when they are retiring.

Both of these propositions have been denied by the decisions of this court.   When there is evidence of another offense the court must instruct the jury with reference to the same, and the failure to do so is reversible error.   Williamson v. The State, 30 Texas Crim. App., 332. The court may recall a jury at any time and give them additional instructions.   Caston v. The State, 31 Texas Crim. Rep., 305.   An exception is in time where opportunity is given the judge to revise his charge and correct the error before the verdict is returned into court. Garrillo v. The State, 31 Texas Crim. Rep., 62.

Welhousen v. The State, 30 Texas Criminal Appeals, 626, was a conviction for theft.   There was evidence tending to prove other thefts. In commenting upon this feature of the case, and after enumerating the circumstances under which such evidence might be admissible, Judge Hurt said:   "If it is not so connected, or if connected it does not tend to serve one of the purposes mentioned, then it is not competent evidence, and it will be error to receive it, though restricted or withdrawn from the jury, for it is known to the profession and this court, from the results shown in hundreds of cases brought here, that if there be strong suspicion against the accused, though the evidence be not sufficient to authorize a conviction, and there is evidence of other offenses before the jury, convictions will follow, notwithstanding

such evidence, when admissible, is properly and carefully limited by the charge, or when inadmissible be entirely withdrawn from the jury."

With this testimony before us we feel that we can with confidence insist that, even if we are mistaken in our views as to the admissibility of the evidence complained of, we are still clearly entitled to a reversal of the judgment of conviction on account of the refusal of the trial judge to limit the jury, in the charge, to the purposes for which they could consider the evidence objected to.

With all of the earnestness of conviction we oppose the admissibility of such evidence. A final judgment of a court of competent jurisdiction, in a proper case against a witness, might with reason affect his credibility, for thereby the presumption of innocence would be destroyed, but for our lives we can not understand how a simple accusation, or how a judgment which has been set aside, and therefore held to be illegal, can raise any presumption against the credibility of a witness. With all respect for those who hold differently, to our minds such a ruling is repugnant to reason and common right; is subversive of elementary principles of law, and if established as a rule of practice will be a scandal and reproach upon our courts. It will result in injustice, and thereby bring the law itself into contempt.

We next invite the attention of the court to the error in the action of the trial court in refusing a new trial upon the ground that after the jury had retired to consider their verdict they received other evidence in addition to that testified to upon the witness stand.

Subdivision 7 of article 777 of our Code of Criminal Procedure says, that new trials shall be granted "when the jury, after having retired to deliberate upon a case, have received other testimony." The State's counter affidavit shows that after the jury retired to deliberate upon the case they did receive other testimony of a highly prejudicial character to appellant.

This question is not open for argument. It is settled by the statute. But the decision of this court in the case of McWilliams v. The State, 32 Texas Criminal Reports, 269, places the question beyond dispute. In that case one of the jurors, in discussing the case, detailed to his fellow jurors conversations about the case which were not sworn to by any witness. He also stated to one of the jurors, C. C. Gears, that he knew enough to satisfy him that the defendant ought to be hung. The jurors to whom Young made these statements all swore that they were not influenced by anything he said in passing upon the case. In reversing the case, Judge Hurt, in rendering the unanimous decision of the court, said: "If the jury, after having retired to deliberate upon the case, shall receive other testimony, a new trial shall be granted; and the additional testimony being against the accused, we will not stop to inquire as to its effect upon the jury or jurors."

Appellant requested the court to instruct the jury, "that if G. W. Hargrove, Sr., father of the defendant, threatened the life of H. W. Spear, the deceased, prior to the day of the killing of said deceased, and for and on account of such threats said deceased attacked said Hargrove in such a manner as was reasonably calculated to induce said Hargrove to believe his life was in danger, said Hargrove, because of such threats, would not be cut off from his right of self-defense, and if he did so believe, then he had a right to act upon the reasonable appearance of danger as though he made no such threats."

This instruction was refused, and appellant excepted. It was in evidence that the elder Hargrove had repeatedly threatened to kill Spear. Smith v. The State, 15 Texas Crim. App., 347; Parker v. The State, 18 Texas Crim. App., 90; White v. The State, 23 Texas Crim. App., 164.

The appellant requested the court to instruct the jury as follows: "The defendant had the right to go to Arlington in company with his father and brother on the day of the killing of deceased (Spear), on business, although he and they may have known at the time of the threats of the deceased towards defendant's father, and of his previous attempts to kill his said father, and the mere fact of their going to Arlington on said day can not be considered as a circumstance to prove defendant's guilt, unless you further find from the evidence in this case, beyond a reasonable doubt, that such was his and their specific purpose and intent at the time."

This instruction was refused by the court. Appellant duly reserved an exception to the action of the court in refusing to give this instruction. Appellant testified, that he accompanied his father and brother to Arlington on business on the day of the difficulty, and states fully what his business was, and the innocent intention of appellant in going. There is other evidence in the record strongly corroborative of appellant's statement. But be this as it may, it was the right of appellant to have the jury instructed upon every phase of the case favorable to him. This right is based upon two of our statutes. One declares that the court shall deliver to the jury a written charge, in which he shall distinctly set forth the law applicable to the case. Code Crim. Proc., art. 677. Where there is a failure to charge upon a theory favorable to the defense arising from the evidence, it can not be said that the court has distinctly set forth the law applicable to the case. It must be all of the law applicable to the case, whether it be favorable to State or defense. It matters not how incredible this evidence may be. That is not a question for the court. It is the sole and exclusive province of the jury to pass upon the question of the weight and credibility of the evidence. A defendant has a right to have instructions based upon defensive evidence, no matter what the evidence for the State may be. The court should instruct the jury upon the

hypothesis that the defendant's evidence may be true. Nally v. The State, 30 Texas Crim. App., 459; Carter v. The State, 30 Texas Crim. App., 556; Willson's Crim. Stats., sec. 2338.

But there is yet another view of this question. The Code of Criminal Procedure, art. 727, declares: "The defendant in a criminal case is presumed to be innocent until his guilt is established by legal evidence; and in case of reasonable doubt as to his guilt he is entitled to be acquitted." When the court instructs upon theories of guilt, and refuses to instruct upon theories of innocence arising from the evidence, the court in effect repeals this statute, and gives preference to the presumption of guilt rather than that of innocence.

The charge of the court is cumulative, and gives undue prominence to the idea that the killing of Spear was in mutual combat, or was the result of a previous agreement of this defendant and his father and brother, such instructions not being warranted by the facts or the law. Even if there had been evidence raising any one of these theories, still it would have been error for the court to have repeated and emphasized the instructions, as was done.

In Irvine v. The State, 20 Texas Criminal Appeals, 41, Presiding Judge White said: "In Taylor v. Townsend, 61 Texas, 144, the court says: 'It is undoubtedly improper for a court to place, by frequent repetitions, too prominently before a jury any principle of law involved in the case.' [Citing Powell v. Messer, 18 Texas, 401.] And especially is such rule important in a criminal case in order to guard against creating an impression upon the minds of the jury as to what may be the opinion of the court with regard to the facts to which the principle is applicable."

In Bonner v. The State, 29 Texas Criminal Appeals, 232, Presiding Judge White says: "In the second paragraph of the instructions the learned judge reiterates the law as to defendant provoking the difficulty, and tells the jury that if he did so he can not justify upon the ground of threats. This instruction was not responsive to the question of the jury, was unnecessary, and was objectionable, in that it was calculated to place too prominently before the jury this feature of the case." He then cites with approval Irvine's case.

In Hays v. Hays, 66 Texas, 609, Chief Justice Willie says: "But be this as it may, this court has said that a judge ought not to repeat a principle already given in charge of the jury, when this would give it undue prominence. Powell v. Messer, 18 Texas, 401; Taylor v. Townsend, 61 Texas, 144."

The instructions of which we complain were not only repeated time and again in the instructions for the State, but were hung, as aforesaid, like a millstone around the neck of the instructions for the defendant. The trial judge could not have given greater prominence to his views of the case.

The court erred in refusing to instruct the jury upon the law of manslaughter.

Appellant's evidence shows that he tried to keep his father from going to Arlington, on account of the animosity existing between his said father and Spear. When assured that his father was compelled to go on business, he then agreed to accompany him, provided his father would not drink any during the trip, and would go down upon the 4 o'clock train and return that same evening. Knowing that his father was in danger of being attacked by Spear, he had a right to carry arms for protection. Otherwise, no man who is in danger of a serious conflict would ever dare to arm himself for his defense.

Now, grant that his father upon reaching Arlington did provoke the difficulty, although there is no evidence to that effect. Yet say that the State is correct, and that this was a mutual combat. How does the case stand? Here is a son who has advised against trouble, who has tried to keep his father out of a difficulty, who is not present for attack, who has no such purpose; a difficulty arises, the father is partly to blame for it, the son has no part in starting the fight. He does not participate in his father's purpose. At the time of the beginning of the fight he sincerely wants peace, but upon seeing his father and brother shot at, he is overcome by sudden and irresistible passion, and kills one or both of their assailants. Of what offense is he guilty? We answer, not more than manslaughter. The law makes allowances for the frailties and imperfections of human nature. It also recognizes the fact that blood is thicker than water. It recognizes the fact that it is not within the power of human endurance for a father to stand by and see his son assassinated, or for a son to be idle when his father is being butchered, even though the father or son may have been somewhat at fault. If a killing occurs under such circumstances, and results from the passion which it would necessarily engender, and if not the result of a preconceived purpose, then it would not be more than manslaughter.

In Guffie v. The State, 8 Texas Criminal Appeals, 203, Judge Clark said: "A master, maliciously intending to kill another, takes his servants with him, and engages his adversary on meeting him. His servants, seeing their master engaged, rush to the rescue and kill his antagonist. In common law this may be murder in the master, but only manslaughter in the servants. The same principle applies to various other relations, including sometimes strangers; but, in law, hot blood is more naturally expected in a case of interference by a near relative or friend than in others more distantly removed. If, therefore, the defendant in this case, not intending to unite with his brother in making an unlawful attack upon the deceased, and not knowing the unlawful purpose of his brother, but awaiting an anticipated necessity for his interference in order to protect his brother from serious bodily

harm or death, threw up his gun and fired simultaneously with the discharge of the pistol by deceased at his brother, or, seeing the intention of deceased to fire upon his brother, and endeavoring to anticipate him, but failing, the deceased being too quick for him, and discharging his pistol first, the defendant is not guilty of any higher grade of felonious homicide than manslaughter, notwithstanding the defendant's brother may have brought on the conflict with malicious intent.    Or if the defendant, with no purpose of injuring the deceased, but desiring and attempting to stop the progress of the difficulty between his brother and the deceased, and with no purpose or intention to aid his brother in an unlawful and violent attack upon the deceased, saw his brother shot down in his presence, and in a fit of sudden passion, engendered by this adequate cause, he voluntarily slew the deceased upon the instant, then he is guilty of manslaughter, and should not be punished for any higher offense."

In the case at bar the jury should have been informed, that if appellant, with no purpose of injuring Spear, but desiring to prevent a difficulty between his father and Spear, and with no purpose or intention to aid his father in an unlawful and violent attack upon Spear, accompanied his father to Arlington, and there saw his father or his brother shot down in his presence, and in a fit of sudden passion, engendered by this adequate cause, he voluntarily entered the combat and slew Spear, he could not be convicted of a higher grade of offense than manslaughter.

Appellant denies that he went to Arlington with any intention to aid in an attack upon Spear.    He says that he first exacted a promise from his father not to drink on the trip, and that at his suggestion a time was selected when they could arrive on the 4 o'clock train and leave on the 7 o'clock train.    All of this was for the purpose of avoiding a difficulty with Spear.    This evidence clearly raises the issue as to his pacific intentions in going to Arlington.    The court ignores this, and suggests to the jury that he went there in pursuance of an agreement to kill Spear the next time that they should meet him; and even goes so far as to suggest that this agreement was made while appellant and his father and brother were on the way to Arlington.    If appellant went to Arlington for the purpose which he testifies to, and without an intent to aid in an unlawful attack upon Spear, and after getting there his father began a difficulty with Spear, of which appellant did not approve and in which he did not join, and after said difficulty was begun, without fault upon the part of defendant, appellant, seeing his father or his brother shot down and beat over the head by Spear, in a fit of sudden passion, engendered by either of these adequate causes, entered into the difficulty and slew Spear, his offense would be manslaughter, and not murder.    If his participation in an unlawful attack upon Spear was not premeditated, but "was under

the immediate influence of sudden passion there engendered by an adequate cause," then under the language of the statute he could not be guilty of murder. Penal Code, art. 593. The entire question depended upon the intention with which he entered the conflict, and frame of mind with which that intention was formed. His testimony is supported by the legal presumption that the last provocation was the cause of his act. According to his evidence, he had not participated in the previous animosities existing between his father and Spear, and the sole as well as the immediate cause of his conduct was that which occurred at the time.

Having given in this evidence, it matters not how incredible it may have appeared to the trial judge, or how many times it may have been contradicted, as it raised a presumption favorable to appellant the trial judge should have given an instruction upon the hypothesis that it was true. Crawford v. The People, 12 Colo., 293.

We regret to note that there appears to be a growing disposition upon the part of the courts to invade the province of the jury, and that too in the face of the statute which makes the jury the sole and exclusive judges of the credibility of the witness, the facts proven, and the weight of the evidence. The idea seems to be, that if the State makes out a prima facie case it is to be at once presumed that the defendant is guilty, and, being guilty, he is not entitled to the protection of the rules and principles of law usually governing such cases. The fact as to whether or not his trial is conducted strictly according to law, or contrary to law, is lost sight of or becomes immaterial, because he is guilty; and, being guilty, he has no right to complain that the law which governs in cases of this sort was not applied in his favor.

We respectfully submit that safety is only to be found in the impartial administration of the law. The disregard of a single legal right upon the ground of the supposed guilt of a defendant sets a precedent pregnant with danger to the administration of justice. If it can be done in one instance it will be repeated in another. As precedents increase the evil will grow, until finally the courts of our country will become engines of wrong and oppression.

No brief for the State found in the record.

SIMKINS, JUDGE.—Conviction for murder in the second degree; punishment for twenty-five years. It is only necessary to notice some of the errors raised in this record.

Appellant, having taken the stand in his own behalf as a witness, was asked by the State whether he had not been tried and convicted in that court for the murder of one Tackett, and over his objections was compelled to answer, that he had been convicted, but on a new trial had been acquitted. In his explanation, the court said the evi-

dence was admitted only for the purpose of affecting, if it did affect, the credibility of defendant as a witness, and he so informed the jury as soon as the evidence was admitted. In his charge, however, the court failed to limit the effect of said testimony, which, without due caution in the charge of the court, was well calculated to prejudice the defendant by presenting him before the jury as a man whose hands were stained with another crime of the same character. A verbal statement by the court as to the object of admitting the testimony was not sufficient. While it is true an exception was not taken to the charge until after the jury had retired, and no special instructions were asked, yet it was the duty of the court to have given the instructions in writing, whether requested or not.

In the motion for a new trial, based on the misconduct of the jury, appellant files the affidavit of three jurors who tried the case, stating that while the jury were considering the case remarks were made by jurors to the effect that the reputation of the defendant and his father and brother as peaceable citizens was bad; that defendant's reputation for truth and veracity was bad; that defendant had murdered several men, and was a hardened criminal, and, if turned loose, would kill somebody else. In the controverting affidavit filed by the State it is admitted, by the two jurors making it, that while considering the case some one said, "The father of defendant was a bad man," and another one answered, "Yes, and the boys, Walker and George, are bad boys; they are always getting in trouble." It is asserted that when these remarks were made some one rebuked those making the remarks, and no other remarks, so far as these jurors know, were made with reference to the character of defendant or his father and brother. The controverting affidavit said, that before the remarks were made every member had voted that defendant was guilty of murder, but the punishment ranged among the jurors from five years to life imprisonment, six being above and six below twenty-five years. The three jurors in behalf of appellant say, that after said remarks were made some of the jurors who up to that time had been in favor of acquittal, or a low term of years, agreed to a verdict of twenty-five years. Subdivision 7 of article 777, Code of Criminal Procedure, declares, that a new trial shall be granted when the jury, after having retired to deliberate upon a case, have received other testimony. The controverting affidavit not only shows that prejudicial evidence was received, but does not deny the remarks charged by the other jurors to have been made. There is the singular absence of affidavits on the part of the jurors Strawn and others, charged in said motion to have been affected by the remarks; and that the controverting jurors did not know of the other remarks does not disprove the fact that they were made. There was no testimony before the jury to the effect that appellant's father and brother and himself were a hard set, and always

getting into trouble; nor that appellant's reputation was bad for truth and veracity. The jury may have well been led by such remarks to agree upon a higher term of years than they otherwise would. The fact, too, that it was stated to the jury, or some of them, that appellant had killed several men, and was already a hardened criminal, would seem to emphasize the necessity of a charge by the court limiting the proof of other offenses to the question of impeachment.

Appellant further complains that the court erred in compelling him, while on the witness stand, to answer that he had killed Bill Smith. The objection is, that by admitting that he had killed Bill Smith he subjected himself to another prosecution for murder. Bill Smith was shot in the same conflict in which Spear was killed, and both were killed in a few moments of each other. The killing of Smith was part of the res gestæ. Could appellant refuse to answer who killed Smith, if he knew? Mr. Wharton says a defendant may be asked whether he has suborned testimony in the particular case, and whether he has been concerned in other crimes, part of the same system. Whart. Crim. Ev., 432. When a defendant takes the stand he waives his constitutional protection, and subjects himself to the peril of being examined as to any and every matter pertinent to the issue, and as to all matters connected with the offense. Id.; McGarry v. The People, 2 Lans., 227; Whart. Crim. Ev., 444, 470  The court did not err.

Appellant further complains that the court erred in permitting the State to ask him whether he had not been tried and convicted for the murder of Henry Tackett, and witness, being compelled to answer, stated he had been convicted, but the conviction had been set aside and he had been acquitted. It is objected that the evidence was immaterial and prejudicial; that the subsequent acquittal shows the conviction to have been wrongful; and the statute declares, that a former conviction shall not be regarded as a presumption of guilt, nor be alluded to in argument (Code Criminal Procedure, article 783); and because homicide, unlike theft and crimes of a depraved nature, does not necessarily reflect on character, for a man may kill and still be worthy of credit. The question asked witness was admissible, for it is now settled that a witness, for purposes of impeachment, may be asked if he has not been convicted of a felony (Carroll's case, 32 Texas Criminal Reports, 431; White's case, ante, p. 177), and a defendant can be impeached in the same manner and to the same extent. Jackson's case, ante, p. 281. The statute invoked by counsel applies only to cases where the defendant is on trial a second time for the same offense for which he was convicted and granted a new trial, and has no application to the question at issue. There is a great difference, as contended by counsel, in the character of felonies; but the nature of the punishment is generally the same, and attended with the same disqualifications; and a charge of any crime, especially a felony, is justly regarded

as a serious reflection upon any one, and it may, and naturally does, affect character. Mr. Wharton says it has been ruled that, to affect his credit, a defendant may be asked whether he has been in prison on other charges. Such is the law in Texas. Quintana's case, 29 Texas Crim. App., 401, and authorities; Carroll's case, 32 Texas Crim. Rep., 431. In Jackson's case, ante, p. 281, it was held that a witness (defendant) may be asked any question that can be propounded to any other witness, and he may be asked whether he has been arrested for burglary, robbery, or theft. Thus it will be seen that the fact of being charged with an offense is regarded as competent evidence to go to the jury as reflecting upon character. While it is true that the party charged may have been acquitted, still the fact that he was charged is a circumstance to [go to the jury. An acquittal does not conclusively show innocence. It shows that guilt could not be proven beyond a reasonable doubt.

It is, however, insisted that to permit a charge of crime to be introduced to affect character presumes guilt from accusation, in violation of the law which declares a man shall be presumed innocent until proven guilty. When a man is accused of crime, the presumption of innocence applies only in the prosecution and trial for the offense itself. Until then, the State, in requiring sureties for his appearance, or in default thereof putting him in prison, does not proceed on the presumption of innocence. Neither should such a presumption attach or be invoked when he takes the witness stand to testify for or against the life or liberty of another man. The tribunal which is to pass upon that life or liberty should know something of the character of those whose testimony the law requires them to weigh (Carroll's case, 32 Texas Criminal Reports, 431), and the same rule applies to defendant when he becomes a witness (Jackson's case, supra). We think, however, there is much force in the criticism of the court's charge made by the able counsel for appellant. In presenting the theory for the State, the court several times suggests the fact that the elder Hargrove fired the first shot at Spear, and began the difficulty. There is no evidence that appellant's father fired the first shot. The evidence leaves it in much doubt whether Spear or the elder Hargrove made the first movement to draw weapons, but the uncontradicted testimony shows that deceased began firing upon the elder Hargrove before he drew his pistol. Indeed, it seems the old man, who was walking off from Spear, looking backward, was shot in the back, and ran under the train and fell before he drew his pistol. Again, the theory of the defense, as presented by the testimony, was that, if an agreement existed between the father and brother to kill Spear, he was not a party to it; that on the contrary he endeavored to dissuade his father from going to Arlington, but finding he was compelled to go upon a matter of business, he agreed to go with him on condition that he would not drink,

and would return home on the next train; that, knowing of the threats against his father's life by Spear, and of the actual attempt to assassinate him, he went to prevent a difficulty, and, if necessary, to protect his life. Now, it is true that if appellant had previously agreed with his father and brother to kill deceased, and went with them for that purpose, and in pursuance thereof killed deceased at a meeting intended or accidental, or if both Spear and all the Hargroves voluntarily entered into a mutual predetermined combat in which Spear was killed, in either event appellant would be guilty of murder upon express malice, and the question of who began the conflict might be immaterial. But if the theory of the defense is true, and appellant was no party to the agreement, but entered into the conflict to protect his father's or brother's life, he would not be guilty, unless he knew they had begun the difficulty. Now, the court presented clearly and strongly the theory of the State, but in stating the converse of the propositions does so in a very negative form. We think justice to appellant's rights required that the court should have instructed the jury, that unless the evidence satisfied them beyond a reasonable doubt that there was an agreement between the Hargroves (including appellant) to kill deceased, and he was killed in pursuance thereof, or that he was killed in a mutual combat, voluntarily entered into by all the parties, they must acquit appellant, unless they were further satisfied that appellant's father and brother began the difficulty, and appellant knew it when he entered into the conflict.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

Judges all present and concurring.