## No. 8620.

## PERRY *v.* THE PEOPLE.

1. NEW TRIAL—*Misconduct—Irregularity.* A verdict to which any misconduct or irregularity, whether by the jury or one not of the panel, may have contributed, cannot be approved. Pending the trial of one indicted for wilful murder, a local newspaper printed a false statement that in the cell of the accused the sheriff had discovered implements and weapons manifestly evidencing a plot to escape, and to kill or disable any one interfering. This was brought to the attention of the jury, during the trial. *Held,* that it must be presumed to have influenced the minds of the jury. A finding of the trial court to the contrary was rejected, as without support either in reason or authority.

2. *Duty of the Trial Court.* Loose practice in the control of the jury, exposing them to impressions produced by extraneous influences, censured.

*Error to Boulder District Court, Hon. Robert G. Strong, Judge.*

Messrs. RINN & ARCHIBALD and Mr. H. L. HONAN, for plaintiff in error.

Hon. FRED FARRAR, Attorney General, and Mr. RALPH E. C. KERWIN, Assistant, for the people.

Mr. THOMAS WARD, JR., Mr. HORACE N. HAWKINS, Mr. LEE CHAMPION, Mr. CHARLES L. HENDERSHOT, and Mr. CLARENCE R. ANDERSON, *amici curiae.*

Mr. Justice Scott delivered the opinion of the court.

TONY Perry was convicted in the District Court of Boulder County of the murder of Steve Kojuharoff, on the 21st day of August, 1914. The crime was found by the jury to be murder in the first degree, and the punishment fixed at imprisonment for life. The defendant was sentenced accordingly.

We will consider but one assignment of error, misconduct of the jury. After the introduction of the evidence

on the part of the people, counsel for defendant presented
to the court a sworn statement which charged in sub-
stance, that during the progress of the trial, and the re-
ception of evidence then being taken, and on the night of
December 29th, 1914, and throughout that day of De-
cember 30th, 1914, great and manifest prejudice has been
caused to said defendant in said trial, by the circulating
of sensational, unfair and untrue reports to the effect that
said defendant had concealed in his cell, and was in pos-
session of, certain files, saws and other objects, by the
use of which he was seeking and would attempt, should
the issues of the trial be found against him, to escape from
the common jail of Boulder County, and to thus avoid a
presumable verdict of guilty which would be rendered
against him in said homicide trial. That such reports were
given as stated, to the editor of the Boulder News, a news-
paper of Boulder, Colorado, having a large daily circula-
tion in said city, under the advice and sanction, as the de-
fendant is informed and believes, of Harold P. Martin,
Deputy District Attorney of Boulder County, and George
Clammer, Special Prosecutor of this District, and Sanford
D. Buster, Sheriff of Boulder County, and said newspaper
did then display this unfair statement and incompetent
state of facts, and did publish the same in said issue of
the Boulder News on the morning of December 30th, 1914,
and that the same was widely circulated through said city,
and is now being so circulated throughout the court room
and among the spectators at the trial; is known to the bail-
iffs in charge of said jury, trying this defendant; is known
to the judge of the court, Hon. Robert G. Strong; is known
to the public generally in said city of Boulder; and has
been brought, as this defendant is informed and believes,
to the notice and attention of the twelve jurors trying him
at this time upon a charge of murder.

It was further charged that the prosecuting officers well
knew that at the times they gave such information and
publicity, that the same was false, and that the articles

were not found in or near the cell of the defendant, but in the cell or cells of other prisoners.

Counsel asked that the jury be discharged and another and different panel be selected. The record discloses that this motion was overruled.

It does not appear that the court made any investigation of these grave charges, which if true, so vitally effected the orderly procedure of the court, the honor of the court's officers, and the material rights of the defendant, then upon trial for his liberty and life. The charges were not denied by affidavit or otherwise. It would seem under the circumstances, that duty and propriety demanded an investigation and finding by the court, as to the truth or falsity of the charges, before proceeding with the trial of the case.

The newspaper publication referred to, carried the article complained of, with headlines in large black type in words as follows:

"JAIL BREAK PLOT OF MINER'S SLAYER FOILED BY SHERIFF. BUSTER FINDS SAWS, FILES, DAGGER AND CLUB HIDDEN IN PERRY'S CELL, READY FOR PRISONER'S USE IN ATTEMPT TO GAIN FREEDOM."

The newspaper article began with the following paragraph:

"A plot to break out of the county jail, including the plan to kill or disable anyone who attempted to interfere, was foiled by Sheriff Sanford Buster last night, when he unearthed a hack saw, two files, a big club and a crude dagger from the air vent in the cell of Tony Perry, who is now on trial for the murder of Steve Kojuharoff in the District Court."

On the same day and in the evening, another daily paper published in the city of Boulder, contained articles to the same effect but with greater detail, and more prejudicial to the defendant, if such were possible. At the time the jury returned the verdict into the court, the jurors were polled, and the court questioned each juror as to his

knowledge of the published and circulated charges concerning the alleged jail delivery, and the finding of instruments and weapons in defendant's cell.

All jurors admitted they had heard the story while the case was before them; one declared he did not hear about it until after the verdict had been agreed upon, but before the verdict was returned. They all had heard it talked about. A majority of the jurors said they had heard it from some fellow juror, some had seen and read the headlines of the newspaper article.

It is a singular fact that while several of the jurors stated that they had heard the story from some one of their fellow jurors, yet every one of the twelve said that he had not spoken of the matter to any other juror. This testimony cannot be reconciled. It casts a suspicion that the whole truth was not told.

These statements were submitted in support of the motion for a new trial. The affidavits of several persons in support of the motion declared the newspapers were of general circulation in the community, and that the discussion of the alleged attempted jail break, and the finding of the tools and weapons in defendant's cell, as alleged in the newspaper articles, was the subject of general comment thereafter, in and outside the court room, during the trial. One person averred that he saw a copy of the newspaper containing the quotation above set forth, lying on a table in the jury room just as the jury was entering the room.

There were no counter affidavits filed nor other contradictory evidence given on the hearing of the motion. The showing was that the newspaper publication was entirely false, and without any foundation in fact, as related to the defendant.

The killing was admitted, and the defense was excusable homicide. The testimony for and against the defendant was directly and positively conflicting. There appears to have been eight eye witnesses to the occurrence. Under the testimony of the defendant's witnesses, the defendant

could not be held to be guilty of murder in any degree. Under the testimony of witnesses for the People the verdict was justified. It was for the jury to determine this conflict. There were no circumstances that would seem to add weight to the testimony of the witnesses for the people. Hence the credibility of the witnesses was necessarily and chiefly a determining factor in the result. The defendant is an Italian and the deceased was a Roumanian. Ill feeling between those of the two nationalities in the mining camp was the apparent source, if not the cause of the homicide.

The defendant, an Italian, had been discharged by the coal company, and the deceased, a Roumanian, had been employed to take his place. The encounter occurred through the circumstance of the wife of defendant meeting and taking the deceased to task, for having taken the job of defendant, and in the language of one of the witnesses, for taking bread from the mouths of defendant's family. It was not a case growing out of strike conditions.

It appears to have been one of the never failing tragedies in the apparent endless struggle of the toiling masses, between themselves, and between them and those who may employ them, for the chance to exist. This feeling of antagonism is apparent in the testimony.

Aside from those who were present, no other person could know the exact truth. The jury could judge as to the conflict in testimony, only in the light of their human judgment and experience. It was therefore a case where justice and fairness, imperatively demanded that the jury should be as free from bias or prejudice as is possible within the conscious human mind.

If the defendant had in fact attempted to break jail and to escape, and if he had collected in his cell tools and dangerous weapons calculated to make such an attempt effectual, this, under the accepted rule of courts, would have been competent testimony against him, as evidence tending to establish conscious guilt. But if the people had presented such evidence to the jury, then the defendant

would have had his clear, fair right to meet his accusers, and to have presented testimony in opposition. But the story went to the jury, and to every juror, and from an apparently credible source. The record discloses it to be untrue in whole and in part. The defendant had no opportunity to meet this obviously prejudicial falsehood with the exact truth. Who can look into the conscious or unconscious mind of each one of the twelve jurors and say that no one, nor all of these were prejudiced by this untruth, which came to them with the color of truth.

It is difficult to understand how the average man can receive information from what he may regard as a reliable source, to the effect that a prisoner has conducted himself as was reported to the jurors in this case, without some impression at least, that the prisoner was a man of criminal intent and purpose.

It was said by this court in *Grant v. Varney,* 21 Colo. 329, 40 Pac. 771:

'The most impartial minds and the most honest men find it difficult to decide correctly and fairly the complicated questions of fact that are submitted for their determination in a lawsuit, without having thrown into the balance that which naturally appeals to passion and prejudice. When such foreign influences are brought to bear upon either trained or untrained minds, it is difficult to tell just what effect they have. Whatever be the merits of his cause, every man is entitled to a fair and impartial trial in courts of justice, according to the established rule of judicial procedure."

This was said in the consideration of a civil case. It is infinitely more important that this great truth shall be born in mind in a case where one is on trial for his life. The test in such a case is not that the jurors were actually prejudiced by the extraneous matter, but whether or not they might have been so prejudiced. That is to say, if the purity of the verdict might have been affected, it must be set aside; if it could not have been affected, it will be

sustained. A verdict upon which doubt rests cannot be sustained.

This is the overwhelming weight of judicial opinion and it applies with equal force, to all cases of misconduct or irregularity, whether committed by the jury, by the bailiff, or other person; and it can make no difference whether such conduct be voluntary or involuntary, if it may have affected the verdict of the jury.

Mr. Hayne in his work on New Trial, has deduced from the authorities, three controlling propositions in considering the subject under discussion. They are:

1. It is not necessary for the moving party to show that the irregularity complained of did in fact materially affect his substantial rights, or that it actually prevented a fair trial. It is sufficient for him to show an irregularity which might have prevented a fair trial.

2. The question in such case is whether the court can see that no injury was done. If it be doubtful from the record whether injury was done or not, the verdict must be set aside.

3. Where the irregularity is shown, it is presumed to have been injurious unless the court can see the contrary from the record. And as a general rule the statements of jurors as to whether they were influenced or not, by any circumstances, are entitled to very little consideration. Vol. 1, §§ 26 and 68, Hayne on New Trial.

The rule of the United States Supreme Court was in *Mattox v. United States*, 146 U. S. 140, 36 L. ed. 917, 13 Sup. Ct. 50, stated by Chief Justice Fuller, to be:

"It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment. *Nor can any ground of suspicion that the administration of justice has been interfered with, be tolerated.*

The court in that case considered an article in a newspaper which purported to be an account of the trial, and where there was no direct and positive charge, as in the

case at bar, as to the defendants alleged misconduct. It was said by the court:

"It is not open to reasonable doubt that the tendency of that article was injurious to the defendant. Statements that the defendant had been tried for his life once before; that the evidence against him was claimed to be very strong by those who had heard all the testimony; that the argument for the prosecution was such that the defendant's friends gave up all hope of any result but conviction; and that it was expected that the deliberations of the jury would not last an hour before they would return a verdict, could have no other tendency."

In the well considered case of *State v. Caine*, 134 Ia. 147, 111 N. W. 443, where it appeared that while the trial was in progress, members of the jury while not in the jury box, read the local newspapers containing accounts of the trial, at least to some extent read these accounts, especially the headlines. The court said:

"However fair these accounts may have been, and for the most part they were unobjectionable as a current report of the proceedings, they were communications with reference to the case which the jurors should not have received. The only discussion of the evidence which the jury should have an opportunity to consider before they are secluded for the consideration of their verdict, are discussions in open court by the attorneys of each party in the presence of those for the other, in which errors of statement may be corrected and improper inferences may be controverted. The jurors should not subject themselves to the danger of misconception and error which must exist if outside persons, without the checks incident to an orderly trial and discussion in court, are allowed to sum up the evidence, emphasize its particular features, and suggest the conclusions to be drawn therefrom. It is scarcely necessary to cite authorities in support of so plain a proposition."

The finding of the court that the story printed in the newspaper did not prejudice the minds of the jury or some of them, cannot be sustained, either upon reason or author-

ity. It was said in the case of *People v. Wong Loung*, 159 Cala. 520, 114 Pac. 829:

· "We know of no rule of law whereby a court is presumed to make such a study of jurors as would enable the judge to say whether or not any particular trier of a case would be influenced by the reading of any article in a newspaper. * * * Upon a showing of misconduct such as was here demonstrated, the law presumes prejudice, and this presumption cannot be overcome by a counter conclusion based upon a mere conjecture that the court knew the mental and moral characteristics of the juror. The presumption of injury from such misconduct is so well established in this state as to need citation of but few authorities."

Under a code provision similar to our own, the Supreme Court of the State of Ohio, *Farrar v. State*, 2 Ohio St., 54, observed:

"Such are the wise and liberal provisions of the new code as to civil cases. They are such as ought always to have been enforced. They depart from an ancient and useless severity, but they preserve the sense and substance of all that ought to be held sacred in the action of a jury. The record before us shows a conduct very opposite to that required by such regulations; and in a case of the least doubt, no verdict of a jury has or can have its usual and proper force and obligation with the court, if it appear that the jury has exposed its privileges to abuse, or listened from its sanctuary to unsworn and irresponsible counsels."

We have not been able to find from the authorities cited by counsel, and those otherwise examined, statements complained of going to the jury as entraneous matter, which, upon their face appear more likely to cause prejudice in the minds of a jury than in the case at bar.

We are constrained to cite with approval the following observations of the Supreme Court of Wisconsin (*Hempton v. State*, 111 Wis. 127, 86 N. W. 596), that:

"There seems to be a growing tendency to looseness in the management of juries in important cases, which calls loudly for a check if not for a substantial reform, if judi-

cial administration is to be kept above suspicion as regards weighing out justice with the highest attainable degree of certainty. At common law, in the trial of capital cases, the jury were required to be kept together from the time they were charged with the case till they were discharged by order of the court, and to be kept secluded from all outside influences of every nature calculated to interfere with their impartiality. They were not allowed to mingle and converse with the people, or have opportunity for reading newspaper or other accounts of the trial, or be influenced by public opinion for or against the accused, or to indulge in the use of intoxicating liquor. The constitution, in preserving the right of trial by jury, preserved it with its ancient safeguards, and any infraction thereof of a nature calculated to substantially impair the right cannot properly receive the sanction of the court."

The judgment is reversed. On rehearing, former opinion withdrawn and this substituted in lieu thereof.

*En banc.*

Garrigues, J. dissenting.