H. C. Snow v. The State.

No. 6208.   Decided October 26, 1921.

Rehearing denied February 1, 1922.

**1.—Murder—Charge of Court—Burden of Proof—Reasonable Doubt.**

Where, upon trial of murder, the theory of the defense was that there were others shooting, and that there was no concert of action, and the shots which were fired were fired because parties believed the officers were robbers, and that they had no information, that they were peace officers, there was no reversible error in the court's charge, which, among other things charged the jury that if defendant shot and killed the deceased in order to prevent him from arresting the parties who were running the game, he would be guilty, and in other portions of the charge instructed the jury upon the presumption of innocence and reasonable doubt.

**2.—Same—Excessive Force—Peace Officers—Attempt to Arrest.**

Where, upon trial of murder, the charge of the court submitted imperfect self-defense and perfect self-defense, and limited the right of the officers to arrest, that they could use only such force as was reasonably necessary, there was no reversible error.

**3.—Same—Motion for New Trial—Misconduct of Jury—Reputation.**

Where, upon trial of murder, it appeared in the motion for new trial that outside evidence was considered by the jury in their deliberations, and improper statements in the jury room affecting defendant's reputation were made, all of which were prejudicial in character, the judgment must be reversed and the cause remanded.

Appeal from the District Court of Wichita. Tried below before the Honorable P. A. Martin.

Appeal from a conviction of murder; penalty, twenty years imprisonment in the penitentiary.

The opinion states the case.

(1)

*Heyser, Hicks & Wilson* and *H. D. Bishop,* for appellant.—On question of misconduct of jury: Mitchell v. State, 36 Texas Crim. Rep., 278, and cases cited in opinion.

*R. H. Hamilton,* Assistant Attorney General, for the State.

MORROW, PRESIDING JUDGE.—Appellant is condemned to confinement in the penitentiary for a period of twenty years for the offense of murder.

At Kemp City, in Wichita County, there was in operation a gambling establishment. On the night of the tragedy, the deceased, Caples, and four other persons, went from Wichita Falls for the purpose of arresting the law-breakers and bring to an end the operation of the gambling house. On reaching the place, the house was found to be filled with people engaged in various gambling games. Some of the party stopped near the front entrance while Caples and his companion, Tony, went inside to the rear of the house. Each of them was armed with a pistol. A number of shots were fired, and Caples and Tony were killed. by some of them. Caples and Tony presented their pistols and ordered the persons in the house to put their hands up. The witnesses, attempting to quote them, used the expressions: "Put them up and get to the wall;" and "Stick them up and face the wall."

The theory of the defense is that there were others shooting; that there was no concert action or pre-arrangement; that the evidence does not exclude the theory that the fatal shots were fired by some one other than the accused; that the shots fired by him were fired because he believed the parties were robbers and that he had no information or knowledge that they were peace officers or the semblance thereof.

The State, on the contrary, presents the theory that the appellant knew that the party consisted of peace officers, and that the shots were fired to avoid arrest of himself or others or out of resentment because of the interference with the gambling operation.

Various rulings of the trial court are urged as reasons for a reversal of the judgment. In appraising the merits of .the criticisms to the charge, other parts of it must be considered. On the phase of manslaughter, the jury was told that if the deceased "was doing some act which, within itself or by words accompanying it, was reasonably calculated to produce, and did, in fact, produce in the mind of the defendant sudden passion," etc., no qualification adverse to the appellant was embraced. On self-defense, in one paragraph, the law of real and apparent danger growing out of the conduct of the deceased as it appeared to the appellant, was embraced. In another, the right to kill the deceased, if appellant believed his purpose was to rob was made absolute. In another, the jury was informed that conducting a gambling house was a felony and that those engaged in it might be arrested without warrant and that "if the jury should believe from the

evidence, beyond a reasonable doubt, that the defendant, Snow, and others, were engaged in exhibiting or running a gaming table," then there existed the legal right to arrest them, and that if the deceased attempted to arrest, using only the degree of force that was reasonably necessary under the circumstances, and was shot by the appellant to prevent such arrest or to escape the consequences of the unlawful act, if any in which he was engaged, his right of perfect self-defense would be abridged, and that his offense might be manslaughter or murder, as the jury might determine. In another subdivision, appellant's right to kill the deceased was affirmed, if, viewing his conduct from appellant's standpoint, it reasonably appeared that he was about to be robbed or suffer bodily injury at the hands of the deceased or his companion. Following these, in the same paragraph, this instruction was given:

"But, if you should find and believe from the evidence that the defendant was not interested or engaged in keeping, exhibiting or running any of said gaming tables, but was only a patron or player in the place, then his right of self-defense would not be abridged by the fact that he was such a participant in the game, unless you should further find and believe that he shot and killed Marvin Caples in order to prevent said Caples from arresting the parties who were running or exhibiting such games."

This is assailed upon the assertion that it puts upon the appellant the burden of proving that he was not a keeper of the gaming house. The clause is immediately followed by a statement in the charge that the burden of proof was upon the State; that the innocence of the accused was presumed until established by legal evidence, beyond a reasonable doubt, and directing an acquittal if a reasonable doubt of appellant's guilt existed in the minds of the jury. In the same connection, the charge instructed the jury, in appropriate language, that if they believed the appellant guilty of an offense, but entertained a reasonable doubt as to its grade, that he must be given the ber₃fit of the doubt. Fairly considered, as a whole, we think the charge was not subject to the objection made. So considered, it does not, in our judgment, place upon the appellant, as said in the objection: "the burden to show that at the time of the killing he was not engaged in running a gambling house." In the same paragraph of the charge, as pointed out above, the jury was specifically told that to qualify appellant's right of self-defense on the theory of arrest, the jury was required to believe, beyond a reasonable doubt, that the appellant and others were engaged in running a gaming table. The language criticised and quoted above, considered in connection with that to which we have just adverted, amounted only to the statement that if they did not believe, beyond a reasonable doubt, that he was conducting a gaming table, his right of self-defense would not be qualified unless he fired to prevent the arrest of those who were so engaged. The right to convict is predicated upon the finding by

the jury of the essential facts, beyond a reasonable doubt, and in the concluding paragraph of the charge to which we have adverted, the law touching the burden of proof and the presumption of innocence is again stated.

Complaint is made of the refusal of the trial judge to give a special charge on the law of excessive force of the officers attempting the arrest. Though the appellant knew that the deceased was authorized to arrest those engaged in exhibiting a gaming table, and though he may have been so engaged, still the officer would have been in the wrong if, in making the arrest, he exercised such wanton and menacing manner as to threaten the appellant or his companions with serious bodily harm. If in such manner the arrest was attempted, the appellant had a right to protect himself. Jones v. State, 26 Texas Crim. App., 11. This right was not unlimited but confined to the use of means proportionate to the necessities of the occasion, as viewed from appellant's standpoint. Ruling Case Law, vol. 2, p. 474; Condron v. State, 69 Texas Crim. Rep., 513; Alford v. State, 8 Texas Crim. App., 545; Keady v. People, 66 L. R. A., p. 363, and note; Creighton v. Commonwealth, 33 L. R. A. (N. S.), p. 150, and note.

The theory that appellant killed the deceased, knowing that he was an officer but defending against wanton conduct in making the arrest, is not presented as an affirmative defense. The defense presented, both by appellant and his witnesses, was that he fired without knowledge that the deceased was attempting to make an arrest and under the belief that his purpose was robbery. As indicated above, imperfect self-defense and perfect self-defense were submitted, the former without qualification and the latter qualified by the theory of lawful arrest. The charge on the subject limited the right of the officers to arrest, and told the jury, in substance, that such right existed only in the event that in effecting it, they used only such force as was, under all the circumstances, reasonably necessary.

Appellant said, in his testimony, that he entered the house, in which the homicide took place, in the evening and was engaged in playing at a game of poker and was facing the rear wall when he heard the words: "Get them up, stick them up damned quick, and face the wall;" that he heard this repeated one time by two men; that he looked and saw, about twelve or fifteen feet from him, a man standing with a revolver. The people were turning tables over and getting up against the wall. He said:

"I just jumped up and the man that had the gun in his hand was looking at me and I jerked my gun and shot him, or shot in that direction. I shot twice."

He claimed that there was confusion and that after he fired he heard the announcement that the parties were officers, but had no such knowledge before he shot. He had more than $800 in his possession, and thought there was an attempt to rob.

In the presentation of all of the defensive testimony, the theory is urged and reiterated that appellant fired before there was any announcement that the parties were officers. The State's testimony was to the contrary. The arrest was attempted at night-time. There were more than half a hundred people present, and gambling by appellant and others was in progress in violation of the law. It was obvious from the equipment and the exhibition of gambling games that the keepers of the house and exhibitors of the games were engaged in committing a felony. Penal Code, Articles 551 and 559. Many of the persons present were armed, as subsequent developments disclosed, and appellant and many others, if not committing a felony themselves, were aiding and abetting those who were. The officers had their pistols in their hands, but so far we discern from the evidence, none were fired by them, and there was no offer to do so before the appellant fired. Under these circumstances, we are of the opinion that the court was not guilty of reversible error in failing in a more specific manner to instruct the jury upon the limitation which the law placed upon the officers, with reference to the use of excessive force in making the arrest. On the contrary, we regard the instructions given as sufficient to fully guard the appellant's rights. His affirmative defenses were well submitted and all defensive theories arising from the evidence were embraced in the charge. The true issue in the case was not whether the officers used undue force in making the arrest, but whether their character as officers was known to the appellant at the time he fired. Around this issue the evidence crystalized. It was pertinently and fairly submitted to the jury.

The motion for new trial was filed some days before it was heard. In it, misconduct of the jury was claimed and supporting affidavits filed. These affidavits were taken before one of the attorneys for the appellant, and, under the previous rulings of this court, are not sufficient. On the day the motion was heard, however, appellant sought, by amendment, to properly verify them. This should have been permitted. Failure to do so is unimportant, however, inasmuch as evidence was fully developed upon the averments in the motion, and in effect, the amendment was allowed. We have made a very careful examination of the evidence adduced upon the motion for new trial. The only part of it that impresses us as at all of importance is that touching the reputation of the appellant. Eight or nine of the jurors testified, one of them Farmer, declaring that in conversation with juror Golden, he (Farmer) remarked "that he did not see how the appellant was guilty;" that Golden said: "You know what kind of reputation he has; you just as well go ahead and cast the vote," and said: "He ought to be convicted on the reputation he has." Farmer was first for acquittal and later consented to conviction.

A vigorous and lengthy cross-examination of Farmer was conducted in which it is brought out that he had had several conferences with the attorneys for the appellant, it being the effort to show that he had

become biased in favor of the accused. Golden did not testify. Juror Reed said he could not say that he had heard references to the reputation of appellant, but it was very likely that something was said but that he could not quote it, though he was sure that appellant was not referred to as a man of the first-class character. He got the impression from the discussion that Snow was a bad man. Juror Galbreath said that he heard Juror Golden make remarks about "matters that were used in argument that Golden appeared to know the reputation of the appellant and said it was bad." Galbreath first voted for acquittal and later for conviction.

Rouse testified that the only reference to the reputation of appellant he heard Golden make was to express the opinion that the appellant was a bad man. Several of the other jurors declared that they heard no conversation on the subject at all.

The law pertaining to the receipt of new evidence of a material character by the jury, either from its members or other source, is not difficult of ascertainment. The statute makes it a ground for new trial. Code of Crim. Proc., Art. 837. It has often been given effect. See McDoughal v. State, 81 Texas Crim. Rep., 179 and cases there cited. No doubt, evidence against the good reputation of the accused, introduced for the first time in the jury-room, would be material. Hargrove v. State, 33 Texas Crim. Rep., 431; Rose's Notes on Texas Reports, vol. 5, page 974. Whether, in the instant case, such evidence was received was a question of fact. The burden of proving it rested upon the appellant, and if the evidence on the motion for new trial was such as rendered the question a controverted one, it was within the province of the trial judge to settle the controversy, and having done so, the decision would be conclusive. Howe v. State, 77 Texas Crim. Rep., 108, 117 S. W. Rep., 500; Shaw v. State, 32 Texas Crim. Rep., 155; Potts v. State, 56 Texas Crim. Rep., 47.

It is difficult to determine whether the proper construction of the testimony of the jurors quoted is that Golden was advancing, as new evidence, his knowledge of the reputation of the accused, or whether he was commenting upon matters in the record which led him to the conclusion that the appellant was a man of bad reputation. The language used by him, as revealed by the witnesses on motion for new trial, seems more or less ambiguous. He said to Farmer: "You know what kind of a reputation he has. He ought to be convicted on his reputation." From other jurors who testified, it appeared that Golden indicated the opinion that the appellant was a bad man. Golden was not called as a witness, and the appellant was content with the version of his declaration given by other jurors at the hearing. From the language used by them, it apparently would not be an unfair interpretation to infer that from the evidence adduced upon the trial, Golden drew the conclusion that appellant was a bad man. This might not have been an unnatural deduction from the facts proven upon the trial. The bill of exceptions, which we are considering, contains no

averment negativing the idea that there may have been brought into the trial, either by proof or argument, matters' forming a proper basis for the deductions imputed to the Juror Golden.

The judgment is affirmed.

*Affirmed.*

ON REHEARING.

February 1, 1922.

HAWKINS, JUDGE.—In the motion for rehearing our attention has been called to a very important and serious matter incident to the alleged misconduct of the jury. The bill of exception presenting this issue covers thirty-nine pages in the record. In reading the evidence taken on the hearing of the motion for a new trial our minds became fixed upon that portion of the alleged misconduct which related to a discussion in the jury room of appellant's reputation, and we disposed of the question on that issue alone, not appraising the effect of the other feature of such alleged misconduct as it related to the facts developed on the trial. We are now referred pertinently to another phase of the alleged misconduct, viz.: a discussion in the jury room of a contemplated raid by the officers upon the gambling premises where the homicide occurred, which bears directly upon what we stated in our original opinion as being the pivotal point in the case, as follows:

"The true issue in the case was not whether the officers used undue force in making the arrest, but whether their character as officers was known to appellant at the time he fired. Around this issue the evidence crystalized."

There is no testimony in the case to the effect that any previous raid had been made upon the premises in question by the officers from Iowa Park, or by any other officers; or that any such raid was contemplated. It being the contention throughout on the part of appellant that he had no knowledge whatever that deceased and his companions were officers until after the shooting was over, it can not be questioned that if testimony had been available to the State, whereby it could have been shown that the officers had at a previous time made, or contemplated making, a raid upon the gambling house, or that a raid was still in contemplation, and that appellant and others engaged in gambling at the time of the homicide knew that the officers were likely to raid the premises, it would have been the most cogent testimony possible to controvert the truth of appellant's theory, to-wit: want of knowledge that deceased and his companions were officers, and not "high-jackers" or robbers as appellant asserts he believed they were.

The jury was bound to have known that one of the main issues in the case, if not the most important one, was whether appellant at the time he fired knew deceased was an officer. This issue was submitted

to the jury by the court. The evidence taken on the motion for new trial discloses that the jury were not in accord as to the guilt of appellant during the first ballots taken, as they stood six and six upon that issue in the begininng of their deliberations. We find from the bill of exception that R. E. Golden was one of the jurors. The juror Farmer, testifying as to what occurred in the jury room said that Golden, who lived in Iowa Park, said: "You know that Turkett and King was out there the night before and he knew what was coming off." "That he understood from what Golden said that the gamblers knew that the officers from Wichita Falls were coming out there that night; that the boys at Kemp City (where the homicide occurred) knew that the raid was going to be made that night." This was Farmer's version of what Golden said. The juror Reed testified that he heard Golden say something about Iowa Park officers, but just how he said it or what he was getting at he did not remember, as he was talking to the jury in general. J. C. Galbraith, who was foreman of the jury, testified that he not only heard Golden make the general statement testified to by other jurors, but that Golden, in substance, told Galbraith himself practically the same thing; his version of what it was is as follows: "The conversation that I heard in substance was that officers had been up to Kemp City to raid this particular gambling house either the day before the shooting occurred or a day just prior to that, and that these people had got knowledge of it and had left and that they were looking for the officers." This witness further testified that as the foreman he informed the other jurors that they should not consider such "outside matters." The juror Brokaw, upon being asked whether he recalled having heard any conversation of Golden similar to that testified to by other jurors replied: "I heard something similar to that, yes. I remember that something was said about the Iowa City officers." The juror Rouse was asked "Do you recall having heard a conversation similar to that testified to by them?" (that is the other jurors). "Did you hear Golden make any statement along the line they testified to?" "I remember some statement, but do not remember what it was." The further question asked him was, "Did he make any remark about those boys were expecting a raid out there?" to which he replied, "Well, he remarked that was his opinion, that is the way he remarked it, his opinion was they expected a raid." Some jurors testified that they heard no such conversation in the jury room, but it was established beyond question that such matter was discussed. Counsel for the State and the court in examining the jurors seemed to have conceded that some "outside matters" were discussed by the jury, because the jurors were asked if they permitted such "outside matters" to influence them. It is not a question, therefore as to whether improper matters occurred in the jury room which might raise a question of fact to be determined by the trial judge upon a motion for new trial. It is not necessary for us to speculate upon the effect of this new matter being injected during the discussion of the jury.

Remembering that the contention of the defense from beginning to end was that when appellant began firing he thought· deceased and his companions were "high-jackers" and not officers it is apparent that these improper statements in the jury room were of a prejudicial character. If such testimony could have been produced by the State from the witness stand it would have been of a highly vital and important nature.

The effect of testimony so received after the retirement of the jury has been adverted to in Gilbert v. State, 85 Texas Crim. Rep., 597, 215 S. W. Rep., 106; McDougal v. State, 81 Texas Crim. Rep., 179, 194 S. W. Rep., 944; Mitchell v. State, 36 Texas Crim. Rep., 278; Weaver v. State, 85 Texas Crim. Rep., 111, 210 S. W. Rep., 698; Blocker v. State, 61 S. W. Rep., 392.

In view of another trial we suggest such changes in the charges discussed in our original opinion as will relieve them of the criticism there reviewed.

The motion for rehearing must be granted. The judgment affirming the case will be set aside and the judgment of the trial court reversed and the cause remanded.

*Reversed and remanded.*