# Richmond

## EUGENE S. THOMPSON v. COMMONWEALTH OF VIRGINIA.

April 21, 1952.

Record No. 3957.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Smith and Whittle, JJ.

The opinion states the case.

*Hubert Peery, Samuel A. Martin* and *Carl C. Gillespie,* for the plaintiff in error.

*J. Lindsay Almond, Jr.,* Attorney General and *Thomas M. Miller,* Assistant Attorney General, for the Commonwealth.

HUDGINS, C. J., delivered the opinion of the court.

This writ of error brings under review a judgment entered on a verdict finding Eugene Thompson guilty of murder in the first degree for killing Jack Sarver, and fixing his punishment at death.

Defendant offered no evidence tending to deny the facts and circumstances of the killing but contends that he was insane at the time.

The evidence for the Commonwealth is that a short time before the killing, defendant became incensed with Jack Sarver because he had been informed that Sarver had made certain derogatory statements concerning him and a woman. Defendant went to Sarver's home and demanded an explanation. Notwithstanding Sarver denied having made the statements, defendant, in the presence of Sarver's wife, said: "I am going to kill you, the only reason I don't kill you right now is because of your wife and baby, I have this wrench in my hand and something else under my coat."

Frank Hammons testified that between 10:00 and 10:30 a. m. on February 16, 1951, defendant asked him to take him from Pearisburg to his home, a distance of approximately three miles. They got into Hammons' automobile and stopped by the post office where defendant had a conversation with Campbell Mutter concerning a pistol. Hammons, at defendant's request, stopped by Mutter's shoe shop, where defendant, without Hammons' knowledge, purchased from Mutter a Smith & Wesson pistol, and five shells, for which he gave a check for $22.00. Defendant then requested Hammons to take him to a hardware store, on the pretext of purchasing parts for his truck. There he bought

13 additional shells for his pistol. The parties then went to Narrows, instead of defendant's home. On their return to Pearisburg, Hammons parked his car, went into the poolroom, and did not see defendant again that day.

Chapman Fuller, defendant's wife's nephew, testified that about noon on the same day, while in the poolroom, defendant asked him to take him home. Fuller informed him that Jack Sarver was driving his wife's automobile which was parked down the street, to which defendant replied he "didn't care who was driving." The three riding on the front seat, with Sarver driving, started towards defendant's home, but before getting out of town defendant gave Fuller money with which to buy a pint of whiskey at the ABC store. The three, Sarver, Fuller and defendant, drank approximately a fourth of a pint of whiskey from another bottle which defendant had. Before reaching defendant's home they saw Emory Chewning at his mailbox. Defendant directed Sarver to stop and ask Chewning if he wanted a drink. Chewning answered in the affirmative and was told to get into the back seat. After he had gotten into the automobile, Sarver, over Chewning's protest, drove off. The four then drank half of the pint of whiskey which Fuller had bought for defendant. Instead of stopping at defendant's home, Sarver was directed by defendant to drive on up the mountain as he wanted to see a farm owned by Fuller. Before reaching this farm, defendant, on the pretext of desiring to look at another place, directed Sarver to turn left on an unimproved road. After driving approximately 75 yards, defendant said: "This is far enough." Sarver stopped the car, defendant opened the door, got out, pulled his gun from under his belt, and said to him: "I brought you out here to kill you * * * get out and start walking." Sarver did not obey, but said: "There was no need in that." Defendant, with his gun in his hand, turned to Fuller, and said: "Get out." When Fuller did not immediately obey the order, defendant said to him: "Do you want me to kill you too?" Fuller got out on the right side, close to where defendant was standing. Defendant, pointing the gun at Chewning, told him to get out on the opposite side, and ordered Chewning and Fuller to "walk behind the car," which they did, and started down the road. Before they had taken more than fifteen steps, defendant said: "Come back, don't you run, if you do I will shoot you." He then turned to Sarver, who was still seated under the steering wheel, and renewed his former

accusation that Sarver had been talking about him and a woman. Defendant told Sarver several times that he was going to kill him and then kill himself. Sarver was begging and pleading with defendant not to kill him. The last thing he was heard to say was that he had a "wife and child to support, please don't shoot." Defendant, standing by the open door of the car, fired three times at Sarver. One bullet entered the right eye and came out an inch over his left ear; another "went in about the mid-section where the collar bones meet, went diagonally and came out about the eighth rib on the left side, and the other one went in his ear and then went down his neck," and lodged in his chest. Defendant went behind the car and fired three shots, each bullet going through the brim of his hat, not touching him. While reloading his pistol, he heard Sarver groan, and said: "I don't believe I killed the son-of-a-bitch." He walked back to the door and shot twice more at Sarver. He returned to the rear of the car and fired two more shots at himself, but was struck by only one bullet, which entered his head just above the right ear, fractured his skull and lodged under the skin on top of his head, causing him to lose consciousness and fall.

Fuller and Chewning pulled Sarver's body from under the steering wheel, put defendant on the back seat, hid the pistol, and started to the hospital at Pearisburg. After going approximately two miles defendant regained consciousness and asked "Where is my gun." Chewning replied "It is over there where you used it." He asked Fuller the same question. Chewning, fearing that Fuller might tell defendant where the gun was, said: "I told you we left it over there where you used it," to which defendant replied: "I know you are a damned liar."

On arrival at the hospital Chewning went in to obtain aid and, as he started back to the car, he met defendant entering the hospital unaided, fully conscious, but bleeding from the bullet wound in the side of his head.

Robert McCormick, Chief of Police of Pearisburg, stated that he reached the hospital about fifteen minutes after the parties arrived. He found Sarver dead, his body still in the car. He saw defendant about 2:30 p. m., and found him rational and normal except for the head wound. The witness, in response to a question asked by defendant about Sarver, told him that Sarver was dead, to which defendant replied: "I have been intending to do it for several weeks."

Shortly after 6:30 p. m. on the same day, defendant asked James Osborne, deputy sheriff, who was guarding him in the hospital, how many times Sarver was shot. When the witness said "two or three times," defendant replied that "he wished he had shot him six or eight more times." At the time defendant appeared normal and rational. Two days later (Sunday afternoon) defendant, of his own accord, began talking about having shot Sarver and told the witness if he had to do it over he would not do it.

Fuller and Chewning testified that from the time they joined defendant until the time of the killing, he appeared normal, rational and in full possession of his mental faculties; that he was not nervous or excited at the time of the killing. He was unconscious from the time he shot himself until en route to the hospital when he began to inquire about his pistol.

Seven witnesses who saw defendant on February 16, 1951, either before or after the killing, testified that he did not appear to be nervous or excited, but calm, deliberate, normal, rational and in full possession of his mental faculties. No witness testified to the contrary.

The testimony for the Commonwealth proves a cold-blooded, deliberate, premeditated murder, and fully supports the finding of the jury.

The only defense offered is that at the time of the killing defendant was suffering from diabetes and was "in insulin shock" to such an extent that he was insane.

Defendant took the stand in his own behalf and did not deny any of the testimony given by witnesses for the Commonwealth, except he did deny he had threatened Sarver's life. He testified that he did not remember anything that occurred from the time he and Fuller, with Sarver driving, were "going out the highway" until he was talking to Ed Hedrick, sergeant of the State police force, in the hospital. (Ed Hedrick testified that he reached the hospital approximately thirty minutes after defendant was admitted). Defendant did not deny making the statements to the other police officers, buying the bottle of liquor, and drinking with his three companions. His answers to the specific questions were "I don't remember."

Defendant testified that he remembered going to Sarver's home and talking with him about the derogatory statements that he had heard Sarver had made about him and the woman. He remembered that they quarrelled, but he denied that he

threatened to kill him. He said that a short time after this quarrel with Sarver, he came to the conclusion that he had been misinformed as to what Sarver had said about him, so he apologized and their friendship was renewed. He had no reason or desire to shoot Sarver. He bought the pistol for the purpose of killing himself. He offered no explanation as to why it was necessary to purchase 18 shells for this purpose.

Dr. W. C. Caudill testified that he was defendant's family physician and had known him for approximately 30 years. In June, 1950, upon an examination, he found that defendant had a tumor in his throat and symptoms of diabetes. When he informed defendant of the result of this examination "His reaction was very sudden, he seemed startled, and he jumped up and said, no he would not have diabetes, he would shoot himself first; he would kill himself before he would have diabetes," and suddenly left the office. Later he returned and the tumor was removed. Defendant was not normal. He was probably "suffering from some form of psychosis in which he was not mentally normal." The doctor prescribed a diet and insulin for defendant's diabetic condition, and directed that the insulin be taken thirty minutes before meals in order to get a better distribution of the medicine in the blood stream, "* * * then when they take food it is ready to cut down the sugar." Drinking whiskey after taking insulin has a similar effect on the system as eating. "There are various degrees of shock that follow an over dose, it may be mild or moderate or it may knock a patient out, they may become unconscious from it."

The doctor, on cross-examination, was asked:

"Q. Have you ever known of a case where a person suffering with insulin shock was able to perform acts in a series of events that required some exercise of strength and movement and after getting over the insulin shock he was unconscious of his actions?

"A. I have never seen a case like that."

Defendant's wife and his sister testified that for several months before the killing they had noticed a marked change in defendant; at times his actions were queer, he was irritable, unable to sleep, talked about committing suicide, and had made two unprovoked attacks upon his wife, and in one of these attacks he shot at her with a rifle.

Mrs. Thompson also testified that defendant's memory was bad. He told her that he did not remember making any attacks upon her or shooting at her. She said that Doctor Caudill first

instructed her to give defendant insulin in doses of 80 units each. This had been reduced to 40 units, which was the dose she gave him between 10:00 and 11:00 on the morning of the killing. A few minutes after she had given him the insulin, and before eating his lunch, defendant returned to Pearisburg to buy chicken feed.

Dr. J. O. Hurt, a psychiatrist, upon being asked to state his findings as a result of his examinations of defendant, made after the killing and while he was in jail, said:

"A. Well, based on the examinations and the history I got from him and from, I think, his wife and his sister and his physician I found Mr. Thompson to be of border line intelligence. I think his mentality would run around ninety-six. He lacks judgment, insight, he has a poor recollection of events, he has certain neurotic findings, tremors and reflex changes that indicate he probably has some brain disease. From the history of the case I find he is a diabetic, has been taking insulin in a very unwise and irregular manner. I believe, at times, he has been under severe insulin reaction * * *.

\* \* \* \* \* \*

"* * * people suffering from a very severe insulin reaction do not have control of their higher senses; they do not have inhibition that a normal person would have, a person that is not affected that way.

"Q. Just what does insulin shock do to one's brain?

"A. It cuts off the frontal lobes, it blocks the higher centers, the thinking centers of the brain.

"Q. Is a person in that condition capable of using judgment or controlling himself as a normal person?

"A. No. A person in that condition is not capable of controlling himself."

The witness testified that his opinion was based on the assumption that defendant had taken protamine zinc insulin, the reaction from which takes place in a patient from two to two and a half hours; that a patient reacts from plain insulin immediately. There is no evidence of the kind of insulin given to defendant, or that he had taken an overdose of it.

■ When the Commonwealth establishes the *corpus delicti* and that the act was committed by the accused, its case is complete. If the accused relies on the defense of insanity, the burden is on him to prove to the satisfaction of the jury that he was insane at the time. Reasonable doubt as to his insanity is not enough to excuse him. "Insanity is easily feigned and hard to

be disproved, and public safety requires that it should not be established by less than satisfactory evidence." *Dejarnette* v. *Commonwealth,* 75 Va. 867, 881.

A careful consideration of all the evidence in this record leads to the conclusion that defendant was entitled to have the question of his sanity determined by a jury. This means a fair and impartial jury, uninfluenced or affected by any testimony except that produced in open court.

Defendant's main contention is that the trial court committed reversible error in its refusal to sustain his motion to quash the venire and discharge the 15 prospective jurors (who had qualified on their *voir dire*) on the ground that statements, prejudicial to defendant, had been made to and discussed by them in the jury room.

For the trial of the issues presented by the evidence the defendant had the right guaranteed by section 8 of the Constitution of Virginia "to demand the cause and nature of his accusation, to be confronted with the accusers and witnesses, to call for evidence in his favor, and to a speedy trial by an impartial jury of his vicinage, without whose unanimous consent he cannot be found guilty."

When the grand jury returned the indictment on March 20, 1951, defendant, by his attorney, moved the court to commit him to Southwestern State Hospital "for observation as to his mental capacity." The court, after due investigation as to the then mental condition of defendant, overruled the motion and set the case for trial on March 28th. On March 27th attorney for defendant informed the court that he had withdrawn from the case and that defendant was no longer represented by counsel. Upon defendant's statement that he was unable to employ counsel, the court appointed Samuel A. Martin, of Giles county, and Hubert Peery, of Tazewell county, to represent him, and the case was set for trial on June 21, 1951. Later, Carl C. Gillespie, of the Tazewell bar, appeared as one of attorneys for defendant.

After 15 jurors had duly qualified on their *voir dire* and had been sent to the jury room to await completion of the panel, E. C. Echols was called as a prospective juror and examined on his *voir dire*. His answers to questions propounded by the court indicated that he was a qualified juror. In answer to questions propounded by attorney for defendant he stated that he had known defendant for twenty-five years or more and that several years prior to the date of the trial defendant had stolen his au-

tomobile and seriously damaged it. He was convicted for the theft but had not paid for the damage to the automobile. Echols stated that, notwithstanding these facts, he had no feeling of bias or prejudice against defendant and could give him and the Commonwealth a fair and impartial trial. The court, over defendant's objection, accepted Echols as a qualified juror and sent him into the jury room with 15 other qualified jurors.

Defendant's attorney, in stating his exception to the court's ruling, said that Echols "must have some feeling of bias and prejudice against the defendant. He admits the defendant stole his automobile several years ago; that it was considerably damaged and never paid for, and to my mind it is not human nature for him to forget about all of that and have no feeling of bias or prejudice about it regardless of what he says. We don't believe he is a qualified juror * * *.

\* \* \* \* \* \*

* * * then this man is going to tell the other jurors the nature of the crime—what he was convicted of. We certainly don't think that would be proper for the jury to hear about that."

The court reconsidered its ruling and stated: "Out of an abundance of precaution I am going to sustain the motion and exclude him." Echols was called back into the courtroom and was told by the judge that he was releasing him as a juror. Immediately defendant's attorney asked Echols if the question of the stolen automobile had been discussed while he was in the jury room. Echols said "Yes," but he was uncertain whether he or some other juror had begun the discussion. He said "anyway it was brought up one way or the other, there were several of them that knew about it * * *. Two or three said something about it. I don't remember what it was. My brother-in-law is in there—was one. * * * Anyway it was mentioned and I told them about it. It would not have the least bit of effect on me." Echols also said that one of the prospective jurors asked him what defendant was using the stolen car for, to which he replied "I told them I thought he was hauling grain to a still, that is in fact what he told me."

None of this evidence, if offered in open court, would have been admissible as a part of the Commonwealth's case. The conviction for stealing the automobile would not have been admissible until after defendant had taken the stand in his own behalf, and then only for the purpose of affecting his credibility. Then, on request, it would have been the duty of the court to tell

the jury of the limited purpose for which the evidence was admitted. Code, sec. 19-239; *Bell* v. *Commonwealth,* 167 Va. 526, 189 S. E. 441. Echols' statement to the jurors to the effect that defendant had used the stolen automobile for an illegal purpose would not have been admissible under any circumstances. However, the vice in the situation is not whether the testimony was or was not admissible, but that the information was given to the jurors in an improper manner and no effort was made to ascertain what effect it had upon them.

In *Litz* v. *Harman,* 151 Va. 363, 144 S. E. 477, this court approved the action of the trial court in setting aside a verdict on the ground that one of the jurors had, during the course of the trial, viewed the scene of the accident and informed his fellow-jurors of the impressions he had gained from the view. In applying the principle that it is error for a juror to inform his fellow-jurors of material facts, based on his personal knowledge, it was said: ''Such is the respect which this court pays to the verdict of a jury that the trial courts should always be alert to see that the jurors are not subject to any unfair or improper influences, and that all of the testimony which tends to affect their conclusion shall be produced in open court.''

We held in *Hickerson* v. *Burner,* 186 Va. 66, 41 S. E. (2d) 451, that whether a new trial should be granted, on the ground that one of the jurors had made an unauthorized visit to the scene of the accident under investigation, and had told other jurors of the impressions gained thereby, depends upon the circumstances of each particular case, and that where the trial judge, after investigating the matter, determines that the unauthorized statements have had no appreciable effect upon other jurors, his judgment on appeal will be conclusive, unless the record shows abuse of discretion.

While the rule was applied in the foregoing civil cases, the reasons are stronger for applying it in a criminal case where the life or liberty of a defendant is at stake.

In 39 Am. Jur., New Trial, sec. 81, p. 95, it is said: ''Statements by a juror to his fellow jurors during their deliberations, reflecting upon the character of the accused, particularly in the absence of any evidence tending to disclose bad character, are generally regarded as vitiating the verdict and requiring the granting of a new trial, at least in cases where there is some indication of prejudice resulting from such statements. Statements by a juror to his fellows concerning other convictions of

the accused are calculated to disparage the accused in the minds of the jury and require the granting of a de novo trial, unless the state affirmatively proves that the defendant did not suffer prejudice by such improper influence. The court cannot, in such case, speculate as to the possible injury that may have accrued to the accused." * * *.

█ The test in a criminal case is not whether the jurors were actually prejudiced by the extraneous matter, but whether they might have been so prejudiced. If they might have been prejudiced, then the purity of the verdict is open to serious doubt and the verdict should be set aside and a new trial awarded. *Perry* v. *People*, 63 Colo. 60, 163 P. 844, L. R. A. 1917D, 921; 39 Am. Jur., New Trial, sec. 95, p. 109; *Snow* v. *State*, 91 Tex. Crim. 1, 237 S. W. 563, 20 A. L. R. 1180, Annotations 1187 and 67 A. L. R. 1523.

█ It is probable that the members of the trial jury who heard the unauthorized statements after being accepted as qualified jurors were influenced by them as much as they would have been if they had heard them after they had been sworn to try the case. *Anthony* v. *Commonwealth*, 179 Va. 303, 18 S. E. (2d) 897. Full faith and confidence in the verdict of a jury require that defendant be given a new trial in order that all evidence for and against him may be introduced in open court and in his presence.

Defendant contends that the trial court committed reversible error when, over his objection, the Commonwealth was permitted, on cross-examination, to ask him about a prior conviction for driving his truck while drunk.

█ This testimony was admissible as tending to disprove the inferences that the jury had a right to draw from the following testimony:

Mrs. Thompson had testified that for the past fifteen years her husband had not been a drinking man, and that during that time she had not seen him drunk. Defendant testified that he took a drink occasionally, but did not drink to excess. He put his reputation as a peaceful, law-abiding citizen in issue when he asked Robert McCormick the following question:

"Q. Have you received any reports in your official position as chief of police of Pearisburg as to any alleged violations or unusual or unlawful actions on the part of Eugene Thompson within the past few months prior to this incident?

"A. No, sir, I have not."

Defendant's next contention is that the trial court committed

error in refusing to permit the wife of defendant to answer the following question:

"Q. Mrs. Thompson, what had been the conduct of your husband toward you; that is, whether or not he was peaceable and kind to you during your married life?"

The question was too broad and would have permitted the witness to state in detail her husband's attitude and conduct toward her during the 27 years of their married life. However, the witness did testify that she noticed a marked change in her husband's attitude and conduct toward her a short time before the killing. Evidence tending to show defendant's attitude and conduct toward his wife before she noticed the change and thereafter was relevant as to the mental condition of defendant. Under these circumstances, the trial court did not commit reversible error in sustaining the Commonwealth's objection to the question as framed.

Defendant's next contention is that the definition of insanity in Instruction No. 8, granted on request of the Commonwealth, is erroneous. This instruction reads as follows:

"The court instructs the jury that the only degree of insanity which the law recognizes as an excuse for crime is that condition of the mind where the accused is unable to distinguish right from wrong and understand the nature and character and consequence of his act, and in this connection the court further instructs the jury that although you may believe from the evidence that on the 16th day of February, 1951, when it is alleged that the defendant, Eugene Thompson, killed and murdered Clarence Sarver, the defendant, Eugene Thompson, was afflicted in some degree with diabetes; that he was at the time of the alleged killing suffering in some degree from the effects of insulin, yet if you further believe from all of the evidence that at the time of the alleged killing the defendant, Eugene Thompson, had sufficient power of mind to enable him to distinguish between right and wrong and understand the nature and character of his acts and the consequence thereof, then the court instructs the jury that he was sane and you shall so find."

The definition of insanity stated in the instruction is known as the "right and wrong test," and is the only one approved in England, Canada and in at least twenty-five States. There is an additional test, known as "irresistible impulse" applied in connection with the "right and wrong" test in a minority of the States.

■ In 14 Am. Jur., Criminal Law, sec. 35, p. 793, irresistible impulse is defined to be "an impulse induced by, and growing out of some mental disease affecting the volitive, as distinguished from the perceptive, powers, so that the person afflicted, while able to understand the nature and consequences of the act charged against him and to perceive that it is wrong, is unable, because of such mental disease, to resist the impulse to do it. It is to be distinguished from mere passion or overwhelming emotion not growing out of, and connected with, a disease of the mind. Frenzy arising solely from the passion of anger and jealousy, regardless of how furious, is not insanity."

Many unsuccessful attempts have been made to formulate a more accurate and scientific definition of legal insanity. The reasons for and against the application of the "irresistible impulse" as excuse for crime, are found in the following authorities: *Smith* v. *United States,* 36 F. (2d) 548, 70 A. L. R. 654, Annotation 659; *State* v. *Roy,* 40 N. M. 397, 60 P. (2d) 646, 110 A. L. R. 1; *State* v. *Maish,* 29 Wash. (2d) 52, 185 P. (2d) 486, 173 A. L. R. 382, Annotation 391; *State* v. *Moore,* 42 N. M. 135, 76 P. (2d) 19; 1 Wharton's Criminal Law, sec. 408, pp. 602-608; 1 Burdick on Law of Crime, The Defense of Insanity, sec. 210, pp. 274-280; 14 Am. Jur., Criminal Law, sec. 36, p. 793; 15 Am. Jur., Criminal Law, sec. 327, pp. 20-22; 53 Am. Jur., Criminal Law, Trial, sec. 664, p. 511; 22 C. J. S., Criminal Law, sec. 61, pp. 126-128.

This court, in the following cases, approved the giving of an instruction embodying the definition of "irresistible impulse:" *Boswell* v. *Commonwealth,* 20 Gratt. (61 Va.) 860, 868; *Dejarnette* v. *Commonwealth,* 75 Va. 867, 878; *Hite* v. *Commonwealth,* 96 Va. 489, 492, 31 S. E. 895; *Stover* v. *Commonwealth,* 92 Va. 780, 22 S. E. 874; and *Thurman* v. *Commonwealth,* 107 Va. 912, 916, 60 S. E. 99.

Judge Staples, in *Dejarnette* v. *Commonwealth,* 75 Va. 867, 878, approved a similar definition, and said: "Certainly no sound exception can be taken to this definition of homicidal mania or irresistible impulse, as it is sometimes termed; a diseased state of the mind, the tendency of which is to break out in a sudden paroxysm of violence, venting itself in homicide or other dangerous and violent acts upon friend and foe indiscriminately."

■ Defendant's evidence was sufficient to take the question of his sanity to the jury, but there is no evidence tending to prove that his volitive powers were any more impaired than were his

perceptive powers. The irresistible impulse doctrine is applicable only to that class of cases where the accused is able to understand the nature and consequences of his act and knows it is wrong, but his mind has become so impaired by disease that he is totally deprived of the mental power to control or restrain his act.

It was held in *Commonwealth* v. *Clark,* 292 Mass. 409, 198 N. E. 641, 645, that the doctrine of irresistible impulse is applicable only where the defendant knows that the act is wrong but is driven by an irresistible impulse to commit it. *State* v. *Riddle,* 245 Mo. 451, 150 S. W. 1044, Ann. Cas. 1914A, 884, 43 L. R. A. (N. S.) 150.

The uncontradicted evidence for the Commonwealth, as heretofore stated, proved an antecedent grudge, threats, plans and preparations for the killing and defendant's statement to the deceased that he brought him to the wooded area for the specific purpose of killing him. The two eyewitnesses to the killing were positive that defendant was unexcited, calm, deliberate and in full possession of his mental powers. Defendant's only explanation of the Commonwealth's testimony was simply "I don't remember."

Doctor Hurt, defendant's mental expert, in answer to the following question, said:

"Q. If a man were going into an insulin shock and was going to be violent or do a violent act while in that insulin shock, would he make preparations for it?

"A. No, I would not think he would."

In the absence of any evidence tending to prove that defendant was driven by an irresistible impulse to kill Sarver, he is not entitled to an instruction on this phase of insanity.

While the statement in Instruction No. 8 to the effect that the only degree of insanity the law recognizes as an excuse for crime etc. is inaccurate, the failure to include in the instruction the doctrine of irresistible impulse does not constitute reversible error as applied to the evidence.

Defendant's other contentions are not of sufficient importance to merit discussion.

For the reasons stated, the judgment is reversed, the verdict of the jury set aside, and the case remanded for a new trial to be had in accordance with the views herein expressed.

*Reversed and remanded.*

EGGLESTON AND SPRATLEY, JJ., dissenting.

As we understand it, the majority opinion holds that the accused is entitled to a new trial because the lower court refused to quash the writ of *venire facias* after it had learned that A. P. Echols, one of the prospective jurors, had discussed with certain of those accepted as jurors the fact that some years previous the accused had been convicted of stealing Echols' automobile. Because of the incident Echols was excused as a juror, but the other members of the panel with whom he had discussed the matter were accepted as qualified jurors.

However improper Echols' conduct may have been, it does not, in our opinion, require the granting of a new trial.

It is, of course, well settled that the communication by a juror to his associates of evidence within his personal knowledge and not adduced in open court may require the granting of a new trial in a criminal case. But it is equally well settled that to require a new trial on this ground the statements made by the juror must be material to the issue before the jury and must result in prejudice to the accused or be of such nature as prejudice therefrom will be presumed. 39 Am. Jur., New Trial, sec. 70, p. 84 *ff;* 23 C. J. S., Criminal Law, sec. 1449-j, p. 1197 *ff*.

In *Litz* v. *Harman,* 151 Va. 363, 144 S. E. 477, cited in the majority opinion, the juror in effect gave evidence to his associates concerning matters which were material to the issues before the jury. This, we held, warranted the lower court in granting a new trial.

But the situation is quite different in the case now before us. The evidence on behalf of the Commonwealth, fully related in the majority opinion, shows a premeditated and brutal murder. The facts and circumstances of the homicide are not in dispute. The sole defense of the accused is that because of an overdose of insulin he was temporarily insane and does not "remember" anything about the homicide. The issue was not whether the accused committed the homicide, but whether he was insane at the time of its commission.

The incident of the theft by the accused of Echols' car, which Echols discussed with his associates in the jury room, is in no way related to the issue of the sanity or insanity of the accused. As Echols said, several of the jurors knew about the incident and discussed it, but regarded it "as unimportant."

The theft of the car was trivial in comparison with the cold-blooded way in which the accused planned to take the life of the deceased and the brutal manner in which the killing was done. In our opinion there is not the slightest probability that this discussion of the previous offense of the accused influenced the jury in finding him guilty and imposing upon him the maximum penalty.

We would affirm the judgment.